BALTIMORE MACHINE & EQUIPMENT, INC. *v.*
HOLTITE MANUFACTURING CO., INC.

[No. 60, September Term, 1965.]

*Decided December 20, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, OPPENHEIMER and McWILLIAMS, JJ.

*John T. Enoch,* with whom were *Goodman, Meagher & Enoch* on the brief, for appellant.

*Donald N. Rothman* and *David H. Fishman,* with whom were *Gordon, Feinblatt & Rothman* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

Baltimore Machine and Equipment, Inc., a maker of tools and machinery, sued Holtite Manufacturing Co., Inc., a manufacturer of heels and soles for shoe repairers, on the common counts and a special count claiming that Holtite had refused to pay for a number of dowel pullers (which Holtite intended to supply to shoe repairers for use in pulling spiked heels from ladies' shoes) which Baltimore Machine had manufactured on order especially for Holtite and which had been delivered to Holtite.

After trial without a jury, at which Holtite's defense was that the dowel pullers were found to be defective and to have broken and crumpled in use, Judge Sodaro gave judgment for Holtite without stating the grounds for his decision. It is to be regretted that counsel did not act under Maryland Rule 564 b 2, as should always be done if an appeal is likely, and move that the trial court dictate or prepare and file "* * * a brief statement of the grounds for its decision * * *" since we are called on to decide the case on a record which contains no finding of fact and no expression of what law Judge Sodaro felt to be controlling.

The parties have briefed and argued the case on the mutual assumption that the decisive questions here, as they were below, are whether the sale of the dowel pullers by Baltimore Machine to Holtite was a sale by sample with an attendant statutory warranty that the bulk would correspond with the sample

in quality, or a sale of future goods to be approved by the buyer, and that Judge Sodaro either found the sale to be by sample and Holtite to be entitled to rescind because the dowel pullers did not conform to the warranty of quality, or that he found the sale to be one of future goods with no attendant warranty. The evidence supported a finding that the sale was by sample and that Holtite was justified in rescinding the transaction on the ground that the dowel pullers delivered to it did not conform in quality to the sample. Whether or not these were the reasons Judge Sodaro rendered judgment for Holtite, we shall affirm because the record offers a basis for determining that Holtite was entitled to prevail. See *Casey Dev. Corp. v. Mont. County,* 212 Md. 138, and other cases cited in 2 M. L. E. Appeals § 323.

The Uniform Sales Act which was in effect when the transactions under review took place provided in Code (1957), Art. 83, § 34, that in the case of a contract "to sell or a sale by sample," there is an implied warranty (a) that the bulk shall correspond with the sample in quality; (b) that ordinarily the buyer shall have a reasonable opportunity of comparing the bulk with the sample; and (c) if the seller is a dealer in goods of that kind, that the goods shall be free from any defect rendering them unmerchantable which would not be apparent on reasonable examination of the sample. The Act, in § 87 of Art. 83 of the Code, provided that where there was a breach of warranty, the seller, as one of his remedies, could rescind the contract to sell or the sale or, if he had already received the goods, could return or offer to return the goods and recover what he had paid the seller. The Act did not define a sale by sample, but this Court did in *Gunther v. Atwell,* 19 Md. 157, 167-68, where it was held that at common law a contract of sale by sample was not a warrant of quality but an agreement of the seller to deliver and of the buyer to accept goods of the same kind and quality as the sample. The Court went on to say:

"The rule * * * seems to be * * * that to fulfil a contract of sale, the seller must deliver that which he has agreed to sell, and that if he does not, the purchaser may rescind the contract, or receive the goods and claim a deduction for their relative inferiority in

value. In order that this principle may be applied, it is necessary, in making the sale, that the sample should be so used between the buyer and seller, as to express or become a part of the contract; or, in other words, that the sample should amount to, and take the place of, an express averment by the seller of the condition and quality of the goods sold, upon which the buyer relies in making the purchase. The mere exhibition of a sample by the seller, and examination of it by the buyer, does not amount to such an averment, unless, from all the facts or circumstances in the case, it can be presumed that an understanding is arrived at between the parties, that the bulk is to correspond with the sample. *Berine v. Dord,* 1 Seld. 73, 93. *Waring v. Mason,* 18 Wend. 425, 434. The reasonable deduction from these cases is, that to effect a sale by sample, so as to bind the seller for a correspondence in bulk, it must be shown that the seller adopts the sample as his own description of the bulk, and that the buyer concludes the purchase upon the faith and credit of the description so given."

In 1959 Holtite's source of supply of dowel pullers (which had proved satisfactory) went out of business and it asked a Mr. Breidenbaugh who was associated with a local maker of tools and machinery to make replacement parts for the pullers. He did so and they also proved to be satisfactory. Holtite then gave Breidenbaugh an order for one thousand of the dowel pullers after he had made "a hand sample" which Holtite inspected and approved. Breidenbaugh became financially unable to proceed and recommended Baltimore Machine as a replacement. He brought Mr. Harbaugh, its plant manager, in to see Mr. Esterson, Holtite's vice-president. After Harbaugh inspected Breidenbaugh's hand sample, he said Baltimore Machine could make such appliances. Esterson then gave to Baltimore Machine an order for one thousand "portable dowel pullers" to cost $4.89 each (Baltimore Machine became obligated to pay Breidenbaugh seventy-five cents per puller) and "to be designed by Mr. Breidenbaugh, similar to sample submitted but to be approved after tooling, before production." Breidenbaugh turned

over to Baltimore Machine his hand sample and a die for use in making the legs of the pullers and it then made three additional dies for use in the manufacture of other parts of the device. Baltimore Machine then made one puller from the production dies and took it and Breidenbaugh's sample to Esterson, who compared the two and found them alike and then, in the words of Harbaugh, "Mr. Esterson had some heels. He pulled some heels and he thought it worked all right", and in response to Esterson's request for speedy delivery, Harbaugh promised to deliver fifty pullers as soon as possible. When the fifty were delivered, Esterson noticed that they were not exactly like Baltimore Machine's production imitation of Breidenbaugh's hand sample in that the legs of the frame were too long in relation to the ratchet, with the result that the ratchet would not reach short heels. Harbaugh said this defect could be cured by replacing the ratchet or by shortening the legs and did the latter. When the reworked fifty pullers were delivered to Esterson, he checked the length of the legs and, according to him, assumed, as his visual inspection seemed to indicate, that all else was in order.

In our view it could properly be found, as Judge Sodaro appears to have done, that Baltimore Machine represented to Holtite that the pullers it would deliver would fit the description Holtite saw in the production model exhibited to it and that Holtite accepted this representation as part of the basis of the bargain and thus concluded its purchase upon the faith and credit of the impression produced by the production model, with the result that there was a sale by sample.

Baltimore Machine says that this could not be so because the Breidenbaugh sample was only to be a guide to suggest to Baltimore Machine a similar form of puller and therefore there was no sample in existence when the order was given, and that the sale was one of future goods to be accepted or rejected by Holtite on subsequent inspection.

Neither contention is sound. Although the order for the one thousand pullers was placed before the production model, which was the sample, was produced by Baltimore Machine, it was conditioned upon approval by Holtite "after tooling [but] before production." When approval was given after tooling, it was of the sample.

In *John E. Smith's Sons Co. v. Lattimer Foundry & Mach. Co.,* 19 F. R. D. 379, 385-89 (M. D. Pa.), *aff'd,* 239 F. 2d 815 (3rd Cir.), the parties had agreed as to price and the seller's ability to produce and the seller then made a sample casting from plans given it by the buyer and sent it to the buyer for approval, and the Court said that there was a warranty "* * * that the castings would be the same as the sample" under both the Sales Act and the Uniform Commercial Code. The Maryland Legislature provided in its adoption of the Commercial Code, in Code (1964 Replacement Vol.), Art. 95B, § 2-313 (1) (c) (which took effect February 1, 1964), that "any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." This provision differs from its equivalent in the Sales Act only in that the warranty is called express instead of implied, although there is authority to the effect that the warranties in a sale by sample under the Sales Act might properly be called express warranties. 1 Williston, Sales § 249 (rev. ed. 1948), and cases cited. The official comment to Sec. 2-313 of the Commercial Code says in paragraph 6:

> "The basic situation as to statements affecting the true essence of the bargain is no different when a sample or model is involved in the transaction. This section includes both a 'sample' actually drawn from the bulk of goods which is the subject matter of the sale, and a 'model' which is offered for inspection when the subject matter is not at hand and which has not been drawn from the bulk of the goods."

Paragraph 7 adds this:

> "The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract. If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order (Section 2-209)."

As paragraph 6 of the official comment in the Commercial Code above quoted says, the fact that the production model exhibited to Holtite was the only dowel puller owned by Baltimore Machine when the sale became final did not prevent the sale from being one by sample. There have been decisions, particularly in earlier days, holding that there could be a sale by sample only where the sample was part of and taken from an existing bulk, but the great weight of authority clearly is that there may be a sale by sample of goods not yet in existence, of goods still to be manufactured. 1 Williston, Sales § 250 (rev. ed. 1948), says:

> "* * * usage both in England and in the United States has broadened the use of the term, and there seems no reason why a contract to produce goods like a pattern should not be called a contract to sell by sample. The 'bulk of the goods' is then equivalent in meaning to 'the goods.' In truth, a sample is simply a way of describing the subject-matter of the bargain, and the principles which are applicable to contracts to sell and sales by description are applicable here. Verbal description may be used (1) as a means of identifying existing goods or (2) as a means of describing the quality of existing goods which are otherwise identified; or (3) as a means of describing non-existing goods. The same principles are applicable where the description is by means of a sample."

See also Annot., "What amounts to a 'sale by sample' as regards warranties," 12 A. L. R. 2d 524, 552 (and cases collected under Paragraph VI, § 16 "View that goods need not be in existence"). See also *Pike v. Fay,* 101 Mass. 134; *Worcester Mfg. Co. v. Waterbury Brass Co.* (Conn.), 48 A. 422; *Ideal Wrench Co. v. Garvin Mach. Co.,* 72 N. Y. S. 662; *Arco Metalscraft Co. v. Shaw* (Pa.), 70 A. 2d 850; *Livingston Shirt Corp. v. Great Lakes Garment Mfg. Co.* (Mich.), 88 N. W. 2d 614; *Roth v. Continental Wire Co.* (Mo.), 68 S. W. 594; *Hal Mfg. Co. v. Schoenling Brewing Co.* (Ohio), 168 N. E. 2d 1; *Modern Farm Service, Inc. v. Ben Pearson, Inc.,* 308 F. 2d 18, 23-24 (5th Cir.).

44

Baltimore Machine did not challenge the fact that the dowel pullers which were delivered to Holtite after the first fifty did not correspond in quality to the production model. It concedes that after a salesman of Holtite told of complaints from shoe repairers, Esterson and Harbaugh tested a number of the dowel pullers on the same type of heels as the production model had successfully worked on, and the legs or the handle buckled or broke on all those tested. Harbaugh offered to make a new stronger puller for Holtite, but the price asked and the shape and size of the suggested device was unsatisfactory. Although he said that he would, Harbaugh never brought the production model out for comparison with the pullers made later, but there was testimony the trier of fact could have found credible and persuasive that the trouble lay in the teeth on the ratchet which were not as deep or at the same angle as on the model, and this caused the pawl to lock and the buckling and breaking as the pull was increased.

There remains only the question whether Holtite's right to rescind and return the pullers without liability for the price, given by § 87 of Art. 83 of the Code, was lost because of anything it did do or failed to do. Paragraph 3 of § 87 provides:

"(3) Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods; or, if he fails to notify the seller within a reasonable time of the election to rescind, or if he fails to return or to offer to return the goods to the seller in substantially as good condition as they were at the time the property was transferred to the buyer. But if deterioration or injury of the goods is due to the breach of warranty, such deterioration or injury shall not prevent the buyer from returning or offering to return the goods to the seller and rescinding the sale."

Mere acceptance of delivery as opposed to assent to receive as one's own, with knowledge of the facts, what is offered is not "acceptance" under the Sales Act. Code (1957), Art. 83, § 67; 3 Williston, Sales § 485 (rev. ed. 1948); *May Oil Burner Corp. v. Munger,* 159 Md. 605; *Henry Glass & Co. v. Misroch* (N. Y. per Cardozo, J.), 147 N. E. 71.

Of the four hundred sixty pullers delivered to Holtite, one hundred were shipped directly to a Canadian plant and another large batch to California. Those delivered to Holtite in Baltimore were received by clerical employees who did no more than verify the number of packages receipted for.

A buyer is entitled to a reasonable opportunity to determine if the goods equal the sample. Code (1957), Art. 83, §§ 34 (b) and 65 (1); Vold, Sales § 34 (2d ed. 1959); Lippel, *A Handbook on the Law of Sales,* 40 (1926). The day Holtite learned that the pullers were defective, it notified Baltimore Machine and rescinded the sale and this was a short time after the physical deliveries to it.

Baltimore Machine argues that Holtite must be deemed to have accepted the pullers when it examined and approved the first fifty after they had been reworked to make the legs and ratchet of proper relative length.

This goes to the provision of § 87 (3) of Art. 83 that if the goods have been delivered to the buyer "* * * he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods * * *." Esterson said he did not know of the defect in the teeth of the ratchet and did not test the reworked machines. Harbaugh said Esterson did test them. Judge Sodaro seemingly chose to believe Esterson. This could well have been because it was conceded that the pullers delivered after the fifty were all defective and if the fifty had been delivered and found satisfactory, they must have differed from those that were delivered later. The shallowness of the teeth, if they were shallow on the first fifty pullers and had been observed by Esterson, could well have been thought by him to be a difference which he would recognize as a defect only after testing. He says he saw no need to test the reworked fifty pullers except to see if the length of the legs had been shortened. Whether what Holtite did was an acceptance of the goods would appear under the circumstances to have been a question for the trier of fact, and we think he could reasonably have determined it was not.

Since the sale was by sample and there was a breach of warranty, Holtite therefore had the right to rescind and promptly did so, and entry of judgment for Holtite therefore was proper.

*Judgment affirmed, with costs.*