## ANDREWS *v.* ANDREWS

[No. 228, September Term, 1965.]

144

*Decided April 1, 1966.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*C. William Tayler,* with whom was *John I. Heise, Jr.,* on the brief, for appellant.

*Joseph B. Simpson, Jr.,* with whom were *Vivian V. Simpson, H. Algire McFaul, Alfred H. Carter* and *Simpson & Simpson* on the brief, for appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

The issue raised by the appellant-mother in this custody case is whether the Chancellor improperly excluded expert opinion testimony of two psychiatrists based on a hypothetical question, but beneath the legal point involved there are the labyrinths of the mother's motivations and the sexual interests of the father.

The parties were married in Montgomery County in 1952. They had two children, both boys, who at the time of the hearing below were 12 and 10. The husband (the appellee and cross-appellant), Dr. E. Wyllys Andrews, had two sons by a previous marriage. In 1956, the couple moved from Montgomery County to Merida, Mexico. Dr. Andrews is a distinguished anthropologist. During the war, he was a lieutenant in the Navy office of strategic services, and, since 1956, he has been working on excavations in Yucatan for Tulane University. The parties separated in 1960; Dr. Andrews remained in Yucatan with the children, and Mrs. Andrews went to Vienna and then to Washington. They were divorced on July 17, 1962, by a decree of the Circuit Court for Montgomery County, in an uncontested action brought by Mrs. Andrews based on voluntary separation.

On May 8, 1962, the parties had entered into a separation agreement. Under that instrument, Mrs. Andrews received land in Montgomery County, worth about $150,000, and $18,750 which was paid in installments. The instrument provided that custody of the children should remain in the father, with rights to the mother to visit them and have them visit with her at reasonable times. Each of the parties was represented by counsel in the preparation of the document. At the divorce hearing before the master, Mrs. Andrews testified she understood the contents of the agreement and asked the court to approve it. It was incorporated in the divorce decree.

On August 24, 1962, about five weeks after the divorce, Mrs. Andrews, while the children were visiting with her in Montgomery County, filed a petition for modification of the decree in which she asked that she be granted custody and guardianship of the children. The petition alleged that Dr. Andrews is a person of immoral character and perverted mentality; the principal ground set forth in support of this allegation is that Dr. Andrews, for many years, has collected and maintained a collection of pornographic photographs.

The history of this collection is of interest in the litigation, apart from its nature and effect upon Dr. Andrews' fitness as his children's custodian. It is undisputed that Mrs. Andrews knew of this collection during the marriage. When she signed the separation agreement in which she consented to her husband's custodianship, she had the photographs in her possession. Without her husband's knowledge, while he was in Merida, she had the safe in which the collection was kept drilled open by a professional locksmith. The separation agreement provided that the photographs, with other personal property of Dr. Andrews, were to be returned to him. Mrs. Andrews returned some of the collection, which Dr. Andrews destroyed, but, without his knowledge, kept some of the photographs which she offered as evidence in the custody proceedings.

In those proceedings, Mrs. Andrews contended that her legal representation when she entered into the separation agreement was improper and inefficient. (At the hearing below, she had other counsel). Testimony was taken on this issue, and, in his opinion, Judge Pugh found as a fact that she was ably represented at the time of the execution of the agreement and at all times prior thereto, and that there was no justification for her accusations. The record amply supports these findings. The Chancellor commented, on this phase of the matter, that Mrs. Andrews is now attempting, after having received all the fruits of the agreement, to use the pictures which she kept in violation of its terms as a weapon to recover the custody of her children, and that she makes no attempt to rescind the agreement by tendering back the real estate and cash which she received under it.

What was in the wife's mind when she executed the agree-

ment, took the real property and cash, retained the photographs, and relinquished custody over the children, and then, within a few weeks after the divorce, used the photographs in an attempt to regain her children, is not a matter for judicial speculation. The compassionate (but not exculpatory) interpretation of her actions is that, lonely and unhappy, after providing for her financial security, she felt, with primeval ruthlessness, that in trying to keep her children with her, no holds were barred. In any event, as the court below pointed out, the controlling issue in a custody case is what is best for the children. The conduct of the mother is only relevant on the question of whether she would be a better custodian than her former husband.

It is only on the issue of which parent should be given custody, from the point of view of what seems best for the children, that the father's interest in pornographic photography is relevant. It is not within the functions or competence of courts to pass judgment upon a man's private tastes or hobbies unless these interests are transmuted into character, and then only to the extent that they influence, or are apt to influence, the legal relationships with which the law must deal. Mrs. Andrews contends that her former husband's pornographic collection is evidence of a deep-seated sexual neurosis and shows his mental and psychological unfitness for custody. While Mrs. Andrews' appeal is based on the lower court's exclusion of opinion testimony as to her former husband's alleged unfitness, a consideration of other portions of the record is necessary for a determination of the propriety of the court's ruling.

The hearing on the wife's motion for custody pendente lite took two days, in August 1962. Custody with the father, who was living in Yucatan, was continued until the hearing on the merits, which took place in February 1964. The testimony and exhibits offered in the 1962 hearing were incorporated in the later proceedings. The exhibits included the portion of the photographs and an album of lewd doggerel retained by Mrs. Andrews from her husband's collection. They were referred to by him as "juvenile erotica" and are admittedly and indubitably pornographic. No useful purpose would be served by a more specific description; the collection is "hard-core" pornography by any standard.

Dr. Andrews testified that he is a collector by nature. His collections have included shells, ash-trays, native objects and stamps. The motivations of a collector, he said, "are very hard to put into words. I was collecting, organizing, putting in albums; each thing would be typical of various aspects of behavior, misbehavior, perversities." He began his collection of juvenile erotica in the late 1940's, and continued it to the time he and his wife moved to Mexico in 1956. The collection consisted of a number of albums, containing from 800 to 1200 items similar to those offered in evidence, acquired from "shady book dealers" and other collectors in the United States and abroad. Dr. Andrews cataloged, indexed and edited the material, and made photographic reproductions and enlargements of some of it in his dark-room at home. His collecting activity was merely a hobby and not connected with his professional work, although, in connection with his work, he has had studies published by the Carnegie Institution of Washington dealing with primitive pornography. His profession is "the study of human behavior; continually how people behave with relation to each other. How they change. What patterns there are in their behavior." He reviewed his collection from time to time, and found pleasure in occasionally meeting with other collectors to show and discuss the various collections. He did not show the collection except to a few mature people he knew had a special interest in it.

Dr. Andrews discontinued his collection in 1956 or 1957 and has made no similar acquisitions since that time. He left the collection in the Montgomery County home when he and his wife moved to Mexico; it was from the safe in the home that the wife later extracted some of it. When his wife returned some of the items after the execution of the separation agreement, he destroyed them, believing he had destroyed the entire collection. He stopped collecting the pornographic material because he no longer "got a kick" out of it; he decided "this was a sort of stupid thing to collect." He has no intention of resuming the collecting. He never showed his collection to his children, and would not approve of their having possession of such material at any time, even if they were adults.

The evidence was strong and uncontradicted (except by his

former wife) that Dr. Andrews is respected, not only as an anthropologist, but as a man. In addition to the testimony to this effect adduced by Dr. Andrews, after the hearing in 1964, the Chancellor, *sua sponte* and commendably, sent interrogatories to the Reverend Robert L. Russell, an American Catholic priest, in Yucatan. (Both parties are Roman Catholics and their children are being raised in that religion). Cross-interrogatories were sent by the parties. Reverend Russell deposed that Dr. Andrews is "well respected as far as I know and can say here in Merida. I always have respected the doctor highly."

The testimony as to Dr. Andrews' relationship with his children, in our opinion, is of particular significance. Dr. Harold Schwartz, who works for the Department of the Army and operates a dairy farm in Emmitsburg, is related to Mrs. Andrews by marriage. He has known her since 1939, and Dr. Andrews since 1945; he was best man at the marriage, and is god-father of one of the boys. He visited the Montgomery County home frequently and testified Dr. Andrews seemed an average, ordinary father; in Dr. Schwartz's opinion, Dr. Andrews would be a proper custodian. Dr. Lester Houck, a former archaeologist and professor at the Universities of Michigan and Texas, is now employed by CIA. He visited the home in Montgomery County on many occasions and made two visits to the home in Merida. In his opinion, Dr. Andrews would be a fit and proper custodian for the children. His relationship with the boys was that of the average father, except that Dr. Andrews, because of his many interests, arouses their curiosity in intellectual matters. Dr. Houck also testified that Dr. Andrews' children by his first marriage are above average, intelligent, well mannered and behaved; the elder is a student at Harvard. Elizabeth Borst was called as a witness by Mrs. Andrews, who is her sister, to testify about an incident to which reference will hereafter be made. Miss Borst visited Dr. Andrews in Merida, at his request, in 1960, to endeavor to resolve the marital difficulties. Mrs. Andrews was then in Europe. During cross-examination, Miss Borst identified a letter she had written to Dr. Andrews after she had returned to this country. In that letter, she referred to her sister, Mrs. Andrews, "and her life of selfishness." She wrote, further, "I also told her of three happy children,

who seemed unaffected by the departure of their mother." (the third child was evidently the younger son of Dr. Andrews' former marriage).

In his opinion, Judge Pugh stated: "There is no evidence in this case that the pornographic pictures or literature were shown to or seen by the two children. The evidence does show that the collection of the pornographic pictures was a hobby of some kind of the defendant-father but that he has since abandoned and ceased to collect or continue this peculiar hobby. The children are happy, healthy and well cared for with their father. He has made ample provision for their well being." There is substantial evidence to support these findings.

The incident to which Miss Borst testified was that while she was visiting Dr. Andrews in Mexico, he tried, unsuccessfully, to seduce her. "Nothing improper occurred." Miss Borst also testified that, in Dr. Andrews' bedroom, there were several photographs of her, taken when she was 7 to 12 years old, clad in a bathing suit. Miss Borst was 20 at the time of her visit.

The physician called by Mrs. Andrews was Dr. Francis Fergus Barnes, of Washington. He has specialized in the practice of psychiatry since 1949, has had clinical experience in the treatment of both adults and children, and is well qualified as an expert. Dr. Barnes had seen the series of exhibits constituting the part of Dr. Andrews' collection retained by Mrs. Andrews and had read the transcript of Dr. Andrews' testimony in the preliminary hearing in August 1962. He had never examined Dr. Andrews as either a treating or examining physician.

As the hypothetical question put to Dr. Barnes forms the basis of Mrs. Andrews' appeal, it is set forth in full. It was as follows:

"Now, assuming that the exhibits that you have just re-examined, being Plaintiff's Exhibits 1 through 19 and 40 through 45, in their entirety, were part of a collection by the defendant, E. Wyllys Andrews, of pornographic photographs and prints that he collected; that he collected such material, assembled it into 8 to 12 albums, each containing about 100 items of this nature; that he catalogued, indexed and assembled it ac-

cording to the various topics of sexual behavior depicted and portrayed in the exhibit; that he used photographic reproductive facilities in his home to reproduce and enlarge some of the material; that he edited it and met with other persons with similar collections to discuss their collections and to view their collections; that such activity on his part lasted from the late '40's to '56; that his purpose in collecting was not connected with his professional activity as an anthropologist or archeologist; that he has not undergone any psychiatric treatment since he began the collection nor since he ended it; that in February, 1960, while Mrs. Andrews, his former wife, was away from home in Mexico Mr. Andrews asked Mrs. Andrews' sister, then age 20, to visit him in Merida, Mexico, and during her stay he displayed on the walls of his bedroom four or five photographs of her sister, showing her from the ages of 7 to 12, and that during her stay he suggested that they have sexual relations. Now assuming all those things, are you able to form an opinion as to Dr. Andrews present psychological condition?"

Dr. Barnes stated, over objection, that he was able to answer the question. He was then asked for his opinion, on the basis of the assumptions contained in the question. Dr. Andrews' counsel objected on the grounds that the question did not fairly set forth the evidence as it had been adduced and that the question was not a proper one. In answer to an inquiry by the court, Dr. Barnes stated that his opinion would be based on what Dr. Andrews' mental condition was in 1956 and "upon the established psychiatric body of knowledge that a person who is morbidly preoccupied with sex, a possessor of such a collection would appear to be—does not always change simply by a decision to destroy the collection of his pornography." Judge Pugh sustained the objection. He said he did not think the doctor was qualified to testify as to what Dr. Andrews' mental condition was as of the present time, which was the issue before the court, and that it was for the court to make the decision as to the significance of the exhibits on Dr. Andrews' present psycho-

logical condition. Mrs. Andrews' counsel then made a proffer that Dr. Barnes would testify that, in his opinion, Dr. Andrews suffers from deep-seated sexual neuroses, that there are indications of voyeurism and fetishism, that he had a morbid preoccupation with sexual matters involving children, and is not a fit person, morally or psychologically, to have custody of two small boys, and that his opinion is not changed by reason of the fact that there has not been any collection of the material since 1956. The court refused to allow the doctor to give his opinion.

Mrs. Andrews' counsel also proffered the testimony of Dr. Frank S. Caprio, who was waiting to testify. Dr. Caprio's qualifications as a psychiatrist were admitted. He is a recognized authority and writer of books on sexual deviations. The proffer was that Dr. Caprio had examined the same material and transcript of Dr. Andrews' testimony as had Dr. Barnes, that, if asked the same hypothetical question as was put to Dr. Barnes, he would state that he was able to form an opinion as to Dr. Andrews' present psychological condition, and that, in his opinion, for various reasons which were given, Dr. Andrews is not a psychologically or morally fit person to have custody of the two boys. The proffered testimony was not admitted.

While the admissibility of expert or opinion testimony is largely within the discretion of the trial court, it is subject to review by this Court. *Turner v. State Roads Comm'n,* 213 Md. 428, 434, 132 A. 2d 455 (1957) and cases therein cited. A qualified medical expert may testify upon hypothetical data alone, without having seen the patient. See *State Use of Solomon v. Fishel,* 228 Md. 189, 196-97, 179 A. 2d 349 (1962) and *Marshall v. Sellers,* 188 Md. 508, 517, 53 A. 2d 5 (1957) and authorities therein cited. A medical expert is not barred from expressing an opinion because he is not willing to state it with absolute certainty; it is not certainty but reasonable probability which is the test. *Baughman Contracting Co. v. Mellott,* 216 Md. 278, 283, 139 A. 2d 852 (1958) ; *Coastal Tank Lines, Inc. v. Canoles,* 207 Md. 37, 45, 113 A. 2d 82 (1955). In a case such as the one before us, psychiatric testimony, if properly presented, could be of material help to the court. The

fact that the expert opinion testimony goes to the very issue before the trier of the facts does not preclude its admission; the test is whether the testimony will be of appreciable help. *Shivers v. Carnaggio,* 223 Md. 585, 588-91, 165 A. 2d 898 (1960) and authorities therein cited.

However, a hypothetical question addressed to an expert must embrace within its hypotheses every material fact in evidence essential to the formulation of a rational opinion concerning the matter to which it relates. *Mathiesen Alkali Works, Inc. v. Redden,* 177 Md. 560, 565, 10 A. 2d 699 (1940). Authorities in other states are divided on the question, and the Maryland rule has been criticized, see 2 Wigmore, *Evidence* §§ 682, 686 (3rd ed. 1940) and McCormick, *Evidence* § 14 (1954), but the *Redden* rule is firmly established as the law of this state. See *Williams v. Dawidowicz,* 209 Md. 77, 86, 120 A. 2d 399 (1956). In our opinion, the hypothetical question involved in this case omitted highly material facts which were in evidence and were essential to the formulation of rational opinions.

We have referred to testimony that the children of the parties seemed to be normal and happy boys. There was similar testimony as to Dr. Andrews' other two older sons by his former marriage. The question put was whether Dr. Andrews was a fit custodian; in our opinion, the testimony that he has been a proper father to all four of his children was an essential ingredient of a hypothetical question, particularly when put to doctors who had never examined him. The testimony as to the good relationship of Dr. Andrews with his boys by his former marriage was undisputed. That he has been a proper father and fit custodian for the two younger boys was only disputed by Mrs. Andrews, who had relinquished custody to Dr. Andrews with full knowledge of the facts she now claims make him an unfit custodian. The actual relationship of the father and sons is clearly relevant in a hypothetical question as to how various factors may be expected to affect that relationship. Because the question contained no reference to this vital portion of the testimony, the objection was well taken and was properly sustained. That the trial judge rested his ruling on other grounds is immaterial. A ruling may be right for the wrong reason; if the ruling is right, it will be sustained, even if the reasons as-

signed were erroneous. *Velasco v. Protestant Episcopal Church,* 200 Md. 634, 640, 92 A. 2d 373 (1952). See also *Baltimore Mach. & Equip., Inc. v. Holtite Mfg. Co.,* 241 Md. 36, 39, 215 A. 2d 458 (1965) and cases therein referred to.

In his opinion on the merits, the Chancellor said: "In considering the question as to whether or not the custody of these two boys should be continued with the defendant-father, as the parties agreed, the Court is guided by the recognized principle of law—what is for the best interests of the children. In determining this question the Court is guided not only by the testimony which it has heard, but the testimony taken before the Master, the demeanor of the mother and the father as observed by the Court. These observations lead the Court to the conclusion that the plaintiff-mother is temperamental, highstrung, uncertain and unreliable. The defendant-father appears to be stable, secure and certain." He found that custody of the children should remain with their father. We have emphasized the vital role of the Chancellor who hears a custody case; unless there is some reason to the contrary, his finding will not be disturbed. *Whetsell v. Wallizer,* 241 Md. 711, 216 A. 2d 571 (1966); *Daubert v. Daubert,* 239 Md. 303, 309, 211 A. 2d 323 (1965); *Sibley v. Sibley,* 187 Md. 358, 362, 50 A. 2d 128 (1946). We see no reason in this case to disturb the Chancellor's finding.

While not changing the basic custody of the father, Judge Pugh did adjust and make definite the visitation periods to which the separation agreement looked. He felt that the children should have the opportunity to be with their mother and that, since the father has the boys throughout the school year, the mother should have them during the Christmas and Easter vacation periods and for two months during the summer. He also decreed that the father should pay the mother $1000 for the services of her solicitor rendered in connection with the petition for modification. Dr. Andrews has taken a cross-appeal from these provisions of the decree.

Counsel for Dr. Andrews contends that the mother did not ask for the enlargement of her visitation rights, but wanted the children taken away from the father altogether. The greater includes the lesser; counsel for Mrs. Andrews made it clear (lur-

ing the argument before us that, if Mrs. Andrews did not prevail in her chief contention, she wanted the children with her for as long as she could have them. Express request for visitation rights in a custody case is not necessary to sustain a decree granting such rights. See *Whetsell v. Wallizer, supra.*

On the merits of this phase of the matter, Dr. Andrews points out that the visitation rights granted by the Chancellor would leave the father with their custody only during the time they are in school, with no opportunity to take them on a vacation from time to time when they are not in school. Moreover, trips between Merida and Maryland are expensive. We think that this provision of the decree should be modified so as to preserve the right of the mother to have the children for the two summer months, but so as to let them remain with the father during the Christmas and Easter vacations. The lower court properly retained jurisdiction so that changes in the visitation arrangements can be made from time to time, if circumstances may indicate such action is advisable. Under Maryland Rule 875 a, the second paragraph of the decree is modified to read as follows:

> It is ADJUDGED, ORDERED and DECREED that the care and custody of Edmund Andrews and Robert Pace Andrews, minor children of the parties hereto, be, and the same is hereby awarded to the defendant, E. Wyllys Andrews, except as follows: That the care, custody and control of said children be, and the same is hereby awarded to the plaintiff, Rosemary E. Andrews, for the months of July and August of each and every year, subject to the further order of this Court.

As to the counsel fee awarded to Mrs. Andrews' attorneys, after a divorce decree *a vinculo,* the divorced wife is not entitled to an allowance of counsel fees with respect to the children, unless the proceedings are reasonable and necessary on behalf of the children. *Carter v. Carter,* 156 Md. 500, 508-9, 144 Atl. 490 (1929). Here we think there was no sufficient showing that the proceedings were necessary for the children's benefit. The counsel fee to Mrs. Andrews should not have been

156

allowed. See *Price.v. Price,* 232 Md. 379, 385, 194 A. 2d 99 (1963).

> *Decree affirmed except that the provision for visitation is reversed in part and modified as above set forth and that the provision ordering the appellee to pay the appellant a counsel fee for her solicitor is vacated; costs of the appeal to be paid by appellant.*