480 A.2d 831

**James Simon WALTERMEYER**

v.

**STATE of Maryland.**

**No. 1421, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Sept. 7, 1984.

Certiorari Denied Dec. 21, 1984.

Michael R. Braudes, Asst. Public Defender, with whom were Alan H. Murrell, Public Defender of Maryland and Gary S. Offutt, Asst. Public Defender on the brief, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., of Maryland, Sandra A. O'Connor, State's Atty., for Baltimore County and J. Scott Smith, Asst. State's Atty., for Baltimore County, on the brief, for appellee.

**72**

Argued before LOWE,* WILNER and BISHOP, JJ.

WILNER, Judge.

On the afternoon of March 29, 1982, appellant beat, mutilated, and strangled to death April Lynn Price, a twenty-year old paraplegic. There was evidence that he had sexually assaulted her as well, although it could not be clearly determined whether the sexual assault occurred before or after she was dead.

For those acts, appellant was charged with, and tried in the Circuit Court for Baltimore County for, first degree murder, rape, sexual offense, and robbery. The State sought the death penalty. At the conclusion of trial, appellant was convicted of premeditated first degree murder, and, after a subsequent sentencing proceeding, was sentenced to life imprisonment. In this appeal, he raises nine issues, none of which have merit and only two of which require more than cursory comment.

The events of March 29 leading to the tragic killing of Ms. Price can be briefly summarized, for there was really no dispute about them.

At about 10:00 that morning, while driving along Dulaney Valley Road in Towson, appellant saw a hitchhiker, one Fred Everhart. He stopped, offered Everhart a lift, and ended up spending the morning with him. First they drove to a liquor store in Edgewood. On the way, they consumed a half-pint of Seagram's Seven whiskey that Everhart had with him, each drinking about half of it, and smoked "a couple of grams, just a little pinch" of marijuana. According to Everhart, appellant drove "in a pretty reasonable manner"; his speech was not slurred. At the liquor store, they each had one mixed drink—a "Jack Daniels and Coke"; they also bought and took with them for subsequent con-

---

\* Judge Lowe participated in the hearing of the case and the conference thereon, but died before the Opinion was filed.

sumption "a couple little tiny miniatures of Amaretto" and a pint of rum.

Upon leaving the liquor store, appellant expressed a desire for some "acid" (LSD), which Everhart thought he might be able to obtain from Ms. Price. They proceeded then to Ms. Price's apartment, consuming the rum and "a couple sips of the Amaretto" on the way. When they arrived, they found Ms. Price and a friend of hers, one James McCarron.

Ms. Price did not have any "acid," nor did she have any marijuana, which appellant also requested. She did, however, arrange to procure a half ounce of marijuana from one Sam Gatto, and so, some time between 2:30 and 3:00 o'clock, she and appellant drove to Gatto's apartment to make the purchase. According to McCarron, no drugs were consumed at the Price apartment, although there was evidence that appellant had "maybe one drink." To Everhart, appellant "seemed pretty normal"—he "wasn't slurring his words around or anything." Everhart waited at the Price apartment with McCarron. He had left his coat in appellant's car, and was expecting appellant and Ms. Price to return shortly.

When they got to Gatto's apartment building, appellant put Ms. Price in her wheelchair, and then waited in his car while she wheeled herself into the building and up to Gatto's apartment. She purchased the half ounce of marijuana and returned with it to the car. That was the last time that anyone other than appellant saw her alive.

The rest of the story comes primarily from appellant's taped and written confessions, about which no complaint is made in this appeal. In these confessions, appellant essentially corroborated the testimony of Everhart and McCarron, except that he claimed to have had "a couple of drinks," instead of "one mixed drink" at the liquor store, and to have "smoked a few bowls of something" at Ms.

Price's apartment.[1] He did not claim to be inebriated when he left the Price apartment.

According to appellant, when Ms. Price returned from Gatto's apartment, "she gave me the smoke and a little piece of paper to eat." They drove around for a while until appellant developed a headache and a nosebleed, upon which he "started drinking some more." He did not say what he drank or where he obtained it. Ms. Price began to complain about his erratic driving, so he pulled over. He tried to remove her wheelchair from his car, but was having trouble doing so. Ms. Price laughed at him. So he beat her until his hands were bloody.

After killing her in a coppice near the fishing center at Loch Raven Reservoir, he drove around to the other side of the reservoir, threw her purse and her shoes into the water, and, successfully negotiating the narrow and winding roads in the area, eventually drove home.

### (1) *The Expert Opinions (Issues I and II)*

Appellant did not deny that he had, in fact, killed Ms. Price, and, indeed, the evidence of his criminal agency was overwhelming. Nor did he deny the brutality surrounding the killing. He attempted to show, as his defense, that, at the time of the criminal acts, through the ingestion of various types and quantities of alcohol and drugs, he was "so inebriated that he possessed no reason or understanding," and that as a result of that degree of inebriation, he was "incapable of forming the requisite *mens rea* which is a necessary element of all specific intent crimes." *See State v. Gover*, 267 Md. 602, 298 A.2d 378 (1973), as explicated in *Johnson v. State*, 292 Md. 405, at 425, 439 A.2d 542 (n. 10) (1982); also *Myers v. State*, 58 Md.App. 211, 219, 472 A.2d 1027 (1984).

---

**1.** Appellant did not define what he meant by "bowls." Everhart used the same term—bowl—in his testimony in connection with the marijuana smoked on the way to the liquor store. He defined it as "just a little pipe maybe this deep, about the size of a dime around."

Appellant's first two issues, which are the ones requiring some analysis, arise from his attempt to pursue that line of defense. He complains that the trial court (1) "impermissibly restricted the data upon which the defense experts could rely in rendering their opinions with respect to the defense of voluntary intoxication," and (2) "erred in refusing to permit the defense experts to render opinions upon 'ultimate issues' in the case."

What, in fact, occurred was this. Appellant proferred the testimony of two experts—a psychologist (Dr. Donner) and a psychiatrist (Dr. McDaniel)—on the ultimate question before the jury. These two witnesses were apparently prepared to opine that, *based upon their understanding of what appellant had ingested* on the morning and afternoon of March 29, he did not, as a matter of fact, have the specific intent necessary for premeditated murder, robbery, or the sexual offense charged to him.

It became clear, as part of counsel's proffer, that these opinions would be based upon the premise that appellant had "consumed a great deal more alcohol, marijuana, hashish and PCP than is in evidence already." Specifically, based solely upon what appellant and his wife and sister (none of whom were to testify) had told the doctors, they were prepared to assume, and to base their opinions on the assumption that

"The police statements do not detail all of the alcohol that he had; he had more. And not all of the marijuana that he had; he had more. And that he additionally had hashish and PCP. They would also say that he has indicated to them in their conversations with him what is known as spotty or partial amnesia for the events, which is very typical of those who are under the influence of alcohol and drugs."

The court placed two limitations on the proffered testimony. First, it ruled that any opinion by Drs. Donner or McDaniel would have to be based on what the evidence showed appellant had ingested, and not upon what appel-

lant, or his wife, or his sister, or anyone else said he had taken. Second, the court agreed to permit an opinion as to whether the ingestion of those substances revealed by the evidence would render appellant so intoxicated as to prevent his performance of a criminal act, but it would not allow an opinion that appellant "did not have the specific requisite intent."

Dr. Donner seemed to have no difficulty in testifying subject to these limitations. Asked to assume that appellant ingested the substances and quantities thereof shown by the evidence—"a half pint of Seagram's,[2] a bowl of marijuana, a mixed drink of Jack Daniels and Coke, part of a bottle of rum, part of a fifth of Jack Daniels, and part of at least six miniatures of Amaretto, assuming further that he took a hit of acid and then he drank some more"—Donner opined, within a reasonable degree of medical certainty, that appellant "would be so inebriated that he would possess no reason or understanding."

Dr. McDaniel was not so flexible; she informed counsel that if she were restricted only to the *evidence* of what appellant had ingested and were unable to consider the other substances and quantities revealed in her conversations with appellant, his wife, and his sister, she could not give the opinion desired by him. As a result, she was not called as a witness.

Relying on *Beahm v. Shortall*, 279 Md. 321, 368 A.2d 1005 (1977), which he confidently tells us is "dispositive," appellant argues that a non-treating medical expert is entitled to rely on hearsay information communicated to him by his "patient" in forming an opinion, and to relate that information to the trier of fact in explaining the basis of his opinion. Relying on a number of Federal cases, he also urges that other hearsay information obtained by the expert may be similarly used and related to the extent that it is of

---

2. This was actually more than the evidence indicated. Everhart stated that he and appellant *shared* the half pint of Seagram's, each consuming about half of it.

a type "customarily relied upon in the profession." Accordingly, he insists that the court erred in denying Drs. Donner and McDaniel the opportunity to use and relate to the jury the information supplied to them by appellant, his wife, and his sister regarding the substances ingested by appellant.

The State responds with the curious argument that *Beahm v. Shortall* is not applicable in a criminal case and that, even if it were, it would not permit an opinion based on statements made by appellant's wife or sister. The Federal cases cited on the latter point, it argues, are not controlling in Maryland.

Both sides, we think, have missed the relevant point.

The issue addressed by *Beahm* was the hearsay rule: To what extent could an expert medical witness rely upon and relate to a jury statements made to him by his "patient" regarding the patient's "history," *i.e.*, statements made

"not only with respect to the 'history' of the case in the sense of the relating of past events concerning the injury or illness, but also with respect to what such person said in giving his symptoms, in describing his feelings or in complaining about the pain he experienced." 279 Md. at 324, 368 A.2d 1005 (n. 1).

For the preceding thirty years, commencing with *Parker v. State*, 189 Md. 244, 55 A.2d 784 (1947), Maryland recognized a distinction between "treating" and "examining" physicians with respect to this matter. As explained in *Candella v. Subsequent Injury Fund*, 277 Md. 120, 353 A.2d 263 (1976), an "attending" or "treating" physician could testify "as to the medical history related to him by his patient and may also state his conclusions reached on the strength of that history." *Id.* at 123, 353 A.2d 263. Such testimony, the Court noted,

"is admitted under an exception to the hearsay rule, the underlying rationale being that the patient's statements to his doctor are apt to be sincere when made with an awareness that the quality and success of the treatment

may largely depend on the accuracy of the information provided the physician." *Id.* 123–24, 353 A.2d 263.

However, in the case of a non-treating physician, "the trustworthiness which characterizes the declaration is no longer assured, since the patient is aware that the statements are being received primarily to enable the physician to prepare testimony on his behalf rather than for purposes of diagnosis and treatment."

In *Beahm,* the Court abrogated that distinction. At p. 327 of 279 Md., 368 A.2d 1005 the Court stated:

"We hold that a physician, who examines a patient, not for the purpose of treatment, but in order to qualify as an expert witness, may present his medical conclusions and the information, including the history and subjective symptoms, received from the patient which provide the basis for the conclusions. The conclusions are admissible as substantive evidence. The statements made by the patient, as narrated by the physician, are admissible, with a qualifying charge to the jury, only as an explanation of the basis of the physician's conclusions and not as proof of the truth of those statements."

The effect of this holding was merely to extend the limited hearsay exception, long recognized with respect to "treating" physicians, to "examining" physicians as well. There is nothing in the language used by the Court to suggest that this extension is not applicable to criminal cases, and we can discern no reason why it should not be so applicable. *See State v. Orsini,* 155 Conn. 367, 232 A.2d 907 (1967); *State v. Girard,* 34 Or.App. 85, 578 P.2d 415 (1978); *State v. Holt,* 222 Tenn. 721, 440 S.W.2d 591 (1969).

The argument made by the State—that it cannot compel the testimony of the *defendant* in a criminal case to test the veracity of the statements allegedly made to the physician—is a completely irrelevant one. For one thing, it would be equally applicable to treating physicians, and the State does not suggest that they would be, or ever have been, precluded from relating and relying upon patient

history in a criminal case. More important, the pertinent inquiry is not into the accuracy of the information given to the doctor, for, as *Beahm* makes clear, that information is not admissible as substantive evidence. The inquiry, rather, concerns the reliability of the expert's opinion to the extent that it is based upon that information, and *that*, of course, *can* be examined by the State through cross-examination of the expert witness.

That same principle can also be used to justify reliance upon relevant history information supplied by other persons. Maryland law has long permitted an expert witness to base his opinion on facts not in evidence, "upon *facts* contained in reports or examinations made by third parties," for example. *Consol. Mech. Contractors v. Ball*, 263 Md. 328, 335, 283 A.2d 154 (1971), and cases cited therein; *Cohen v. Rubin*, 55 Md.App. 83, 98, 460 A.2d 1046 (1983), *cert. denied* 300 Md. 667, 480 A.2d 807 (1984). The *source* of the expert's information, then, is not the controlling factor. *Cf. Attorney Grievance Commission v. Nothstein*, 300 Md. 667, 480 A.2d 807 (1984).

■ To put the issue in its proper perspective, we have to start with the basic proposition that the admissibility of expert or opinion testimony is largely within the discretion of the trial court, subject to review on appeal, and that "the test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented." *Shivers v. Carnaggio*, 223 Md. 585, 588, 165 A.2d 898 (1960); *Andrews v. Andrews*, 242 Md. 143, 152–53, 218 A.2d 194 (1966); *Cider Barrel Mobile Home v. Eader*, 287 Md. 571, 584, 414 A.2d 1246 (1980). It follows from this that not every opinion of an expert is admissible, whatever its form or the source of the information upon which it is based. Indeed, if an opinion, however constructed, is likely, for any reason, to confuse or mislead the jury, rather than to help it in its deliberations, the opinion ought *not* to be admitted. We see

this most frequently with opinions sought through hypothetical questions that either omit essential facts in evidence or include as assumed facts matters about which the evidence is in conflict. *See, for example, Mathiesen Alkali Works v. Redden,* 177 Md. 560, 10 A.2d 699 (1940); *Hadid v. Alexander,* 55 Md.App. 344, 462 A.2d 1216 (1983).

■ In the case at bar, the evidence showed that, at most, appellant had ingested the substances and quantities ultimately included in the hypothetical question to Dr. Donner. There was no evidence that he had taken PCP or hashish or that he had smoked any more marijuana or drunk any more alcohol than that stated by Everhart, McCarron, or in his own confession. In deciding whether appellant was so inebriated as to possess no reason or understanding, and thus was incapable of forming the requisite specific intent, the jury could consider only what the evidence showed. It was properly so instructed. It could not, as a matter of law, be permitted to speculate that appellant had ingested anything else, or anything more.

Of what value, then, was an opinion on the ultimate issue based on the assumption that appellant had indeed ingested other substances, or a greater quantity of substance? What use could the jury properly make of such an opinion? The answer to both questions is "none." Such an opinion would have been completely irrelevant; it could have no function other than to confuse or mislead the jury. *That* is why it was inadmissible.

Appellant's second complaint deals with the court's limitation on the form of the expert opinion. Counsel sought to have Drs. Donner and McDaniel testify that appellant did not in fact have the requisite specific intent to murder or rob Ms. Price. The court refused to permit that, opting instead to allow the witnesses, if they could, to testify as to whether the ingestion of the various substances would render appellant "so intoxicated [he] couldn't perform or do the criminal act." It seems from the rather extensive discussion on the matter that the court was attempting to

distinguish between an ultimate issue of fact, which was for the jury to decide, and a medical opinion that the jury could assess and use in reaching its decision.[3]

As to Dr. McDaniel, of course, appellant's complaint is moot; she was unable to give *any* opinion favorable to appellant in light of the court's insistence that she restrict herself to the evidence. Dr. Donner, on the other hand, opined on direct examination that appellant was so inebriated at the time of the killing that "he would possess no reason or understanding." That, of course, is the essential predicate set forth in *State v. Gover* and footnote 10 of *Johnson v. State*, both *supra*, for, as noted in those cases, if a defendant is inebriated to that extent, "he has reached that stage of intoxication that renders him incapable of forming the requisite *mens rea* which is a necessary element of all specific intent crimes." On cross-examination, Donner stated his conclusion that "[a]s a result of toxic psychosis, the inebriations, the intoxication from the drugs, acid, alcohol he took, he was substantially impaired, could not appreciate what he was doing or conform his conduct."

■ As appellant correctly points out, "[w]hile the opinion of an expert on a matter of law may be inadmissible ..., the opinion of an expert, even on the ultimate issue of fact, is admissible if it is relevant and will aid the trier of fact." *Cider Barrel Mobile Home v. Eader, supra,* 287 Md. at 584, 414 A.2d 1246; *State v. Conn,* 286 Md. 406, 408 A.2d

---

**3.** The discussion on this point was indeed extensive. At one point, the court summarized its ruling thusly:

"THE COURT: Well, I think Dr. Donner is entitled to, if we [*sic*] can, present evidence, and I think this is based on the reference to intoxication by drugs and alcohol, that he can testify what, I guess, what consumption would cause an accused to become so inebriated that an accused would possess no reason or understanding. In other words, that he has reached that stage of intoxication that renders him incapable of forming the requisite *mens rea* which is the necessary element of all specific intent crimes. The degree of intoxication necessary, according to *Johnson,* must be so great that it is comparable with that degree, as I understand the case, of mental incapacity that would render him legally insane. He would have to be so drunk he was legally insane, in effect."

700 (1979); also *Millard v. State,* 8 Md.App. 419, 426, 261 A.2d 227, *cert. denied* 257 Md. 735 (1970). That said, we still find no reversible error.

■ The court instructed the jury with respect to the specific intent necessary for premeditated murder and robbery, the State's burden of proof on that issue, the extent to which voluntary intoxication can negate the requisite specific intent, and the use that could be made of Dr. Donner's opinion. The jury was told, in relevant part, that

> "It is the duty of the State to prove beyond a reasonable doubt that the defendant had the specific intent to commit both crimes. If you do not believe that he had the specific intent with regard to any or both of these crimes, or if you have a reasonable doubt as to whether or not he had a specific intent with regard to these two crimes, then you must find him not guilty.
>
> \*     \*     \*     \*     \*     \*
>
> The defense has presented psychological testimony. In order for the defense to prevail, their expert testimony need not convince you that the defendant lacked the specific intent. It need only be sufficient to raise a reasonable doubt in your mind. Thus, if you find on the basis of the testimony of the defendant's psychologist that the defendant lacked specific intent, you must find him not guilty.
>
> The psychologist was Dr. Donner. Dr. Donner need not persuade you totally or be more convincing. He need only be sufficient to raise the reasonable doubt. Now, after hearing the expert psychological testimony submitted ·by the defendant, if a reasonable doubt has been raised in your mind with regard to the specific intent of the defendant required to these crimes, then you must find him not guilty of first degree murder and not guilty of robbery.
>
> \*     \*     \*     \*     \*     \*
>
> The fact that the defendant may have been intoxicated by alcohol or a combination of alcohol and drugs at the time

of the commission of the alleged crime may be considered by you as bearing upon his state of mind as to whether or not he had the required specific intent.... The issue with respect to the charges is not whether the defendant was intoxicated by alcohol, drugs, or a combination thereof at the time of the commission of the alleged crimes; it is whether the defendant was so intoxicated by alcohol and drugs or a combination thereof at the time the act was committed as to be incapable of forming the specific intent, that is, the capacity to deliberate and premeditate with regard to the homicide and the intent to permanently deprive Ms. Price of her property with respect to the robbery, which are elements of the crime.

In other words, you may consider the defendant's intoxication by alcohol, drugs, or a combination thereof in determining whether the State has proven beyond a reasonable doubt that the defendant had the specific mental state for the crimes. If, after a full and fair consideration of all the facts and circumstances in evidence, you find that the defendant drank alcohol and ingested drugs to the extent that he was without capacity to form the specific intent, or if you have a reasonable doubt on this point, then you must find the defendant not guilty of the crimes. And, of course, the contrary, also."

In light of these instructions, we think that appellant received essentially what the law requires. If the jury believed and credited Dr. Donner's opinion that appellant was so inebriated that he possessed no reason or understanding and that he could not appreciate what he was doing or conform his conduct to the requirements of the law, under the court's instructions, it would have had to acquit. That it did not do so, upon this record, cannot reasonably be attributed to the lack of an opinion on the "ultimate issue," but rather to the fact that it simply did not believe even the lesser opinion rendered by Dr. Donner. If there was error, in the form of an abuse of discretion, in not allowing the more direct opinion sought by counsel, it was clearly harmless beyond a reasonable doubt.

■■■■■■■■■■■■■■■■■■

### (2) *Other Issues*

Appellant's remaining seven issues need not detain us long.

■ Appellant's trial counsel seemed to have a penchant for mistrial motions, making one at nearly every turn. The one pressed here came during Fred Everhart's testimony. Everhart, in response to a general question, said that during their conversation on the morning of March 29, appellant told him that he (appellant) had once lived in California, that while in California he belonged to a motorcycle gang, and that the gang "had killed a couple police officers." This statement was known to defense counsel; it was included in the police reports that had been given to counsel.

The court denied the motion for mistrial, but sustained appellant's objection to the answer and clearly and strongly admonished the jury to disregard it. The jury was told not only that Everhart's statement was irrelevant, but that "[t]here's no evidence of any crime there and no evidence of any conviction for such a crime...." Later, and without contradictory comment, the court observed that, in response to its admonition, the jurors all nodded their heads in agreement, indicating that they would follow the court's instruction and disregard the objectionable remarks. On this record, there was no abuse of discretion in denying the motion for mistrial. *See Myers v. State, supra,* 58 Md.App. 211, 472 A.2d 1027.

Appellant requested a "missing witness" instruction because of the State's decision not to call Dr. Michael Spodak. The State had retained Dr. Spodak to examine appellant for possible use as a rebuttal witness to rebut expected testimony from Drs. Donner and McDaniel. After hearing Dr. Donner's testimony, however, the State decided not to call Dr. Spodak. Dr. Spodak was, of course, available as a witness for appellant. *See Yuen v. State,* 43 Md.App. 109, 114, 403 A.2d 819, *cert. denied* 286 Md. 756 (1979), *cert. denied* 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1980).

Under these circumstances, appellant was not entitled to the instruction.

Appellant's fifth complaint, that certain grand jury testimony was not transcribed, is answered by *Jones v. State*, 297 Md. 7, 22, 464 A.2d 977 (1983) (per curiam on motion for reconsideration). His sixth complaint, that the jury was "death-qualified," is answered by *Chadderton v. State*, 54 Md.App. 86, 456 A.2d 1313, *cert. granted* 296 Md. 172 (1983), *dism. as improvid. granted* 298 Md. 421 (1984).

■ Appellant's seventh complaint is that a juror was not stricken for cause when he gave an equivocal answer as to whether he would be influenced in the death sentencing phase by the possibility of parole from a life sentence. As the death penalty was not, in fact, imposed, we fail to see any prejudice to appellant. *Boone v. State*, 2 Md.App. 80, 233 A.2d 476 (1967).

Penultimately, appellant asks us to overrule the Court of Appeals' rejection of the "diminished capacity" defense in *Johnson v. State, supra*, 292 Md. 405, 439 A.2d 542, which, of course, we have no authority to do. And finally, he argues that the indictment against him should have been dismissed because of sexual discrimination in selecting the foreman and assistant foreman of the grand jury. The record does not support his underlying contention that the selection process was so flawed. *See*, in addition, *Hobby v. U.S.*, — U.S. —, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984).

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.