527 A.2d 766

**In re JESSICA M. and Joseph M.**

**No. 1329, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

July 8, 1987.

Certiorari Granted Oct. 28, 1987.

Nancy S. Forster, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Sherry L. Kendall, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief) Baltimore, for appellee, Dept. of Social Services.

Lee D. Hoshall (Susan P. Leviton, Richard L. North, on the brief), Baltimore, for appellees, Jessica M. and Joseph M.

A. McIntyre Ehrlich, Bethesda, on the brief, for appellees, Foster Parents.

Argued before ALPERT, BLOOM and POLLITT, JJ.

ALPERT, Judge.

In this case, the mother of two children determined to be in need of assistance appeals an award of custody to foster parents who intend to leave America for three years.

In July, 1984, police officers in Baltimore City found three children alone and unsupervised. The children included Joseph M., about three months old, and Jessica M., about eighteen months old. They were placed in emergency shelter care. On October 3, 1984, the Baltimore City Department of Social Services (BCDSS) filed petitions alleging that Joseph and Jessica were children in need of assistance. The petitions alleged, *inter alia,* that appellant, Rosemary H., their mother, was unable to provide adequate care for the children due to her use of drugs.

In November, the children were placed in foster homes pending an adjudicatory hearing. At that hearing, held January 30, 1985, Jessica and Joseph were found to be children in need of assistance (CINA) and were continued in shelter care pending a disposition hearing.[1] Soon thereafter, the children were placed in the home of appellees Edward and Mary P. (hereinafter "the foster parents").

---

**1.** A "Child in need of assistance" is a child who requires the assistance of the court because:

(1) He is mentally handicapped or is not receiving ordinary and proper care and attention, and

(2) His parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems provided, however, a child shall not be deemed to be in need of assistance for the sole reason he is being furnished nonmedical remedial care and treatment recognized by State law.

Md.Cts. & Jud.Proc. Code Ann. § 3–801(e) (1984).

On April 3, 1985, a disposition hearing was held. The master recommended that the children be committed to BCDSS and recommended conditions concerning counselling for the children's mother, care for the children, and visitation.

On April 30 of the following year, a review hearing was conducted during which the children's father signed a stipulation placing Jessica and Joseph with the foster parents. The stipulation disclosed the foster parents' plans to move to England for a three-year period and included an agreement that they would not file for adoption while in England but would institute those proceedings only in Maryland. The children's mother did not attend this hearing, nor did she sign the stipulation. The circuit court incorporated the provisions of the April 30 stipulation in an order dated May 15, 1986. That order was vacated pending a hearing on exceptions subsequently filed by the children's mother.

On May 28, 1986, a *de novo* hearing on those exceptions was conducted in the Circuit Court for Baltimore City. The court received substantial evidence of the relative fitness of the children's mother and of the foster parents to care for Jessica and Joseph.[2] At the conclusion of the hearing, the court overruled the mother's exceptions. The court's order, dated June 5, 1986, granted custody and guardianship of the children to the foster parents and allowed visitation to the mother "under reasonable circumstances given that [the foster parents] may be residing outside the Continental United States."

We are called to answer these questions:

1.  Whether the juvenile court abused its discretion by awarding custody and guardianship of appellant's children to foster parents the court knew to be leaving the country?

---

**2.** The children's father, by signing the April 30, 1986 stipulation, had withdrawn from this custody battle.

2. Whether the juvenile court lacked jurisdiction to issue the June 5, 1986 custody order?

3. Whether the juvenile court was required to state its reasons for placing Jessica M. and Joseph M. in the custody of the foster parents pursuant to Rule 915b?

### 1. Visitation

Appellant asserts that the June 5th order allowing her "visitation under reasonable circumstances" is illusory because the foster parents intend to leave the country with Jessica and Joseph. While appellant agrees that the children are better off with the foster parents for the time being, she contends that the anticipated move overseas, coupled with her indigency, will effectively terminate her right to visitation. That termination, she argues, constitutes an abuse of discretion.

The record demonstrates the absolute indigency of the children's mother. She has been unemployed since 1984 and has depended on theft and charity for income. Relatives with money have displayed an unwillingness to provide any support to appellant. While the foster parents have made vague promises to assist the mother in exercising her visitation rights, they are under no compulsion to do so. Clearly, the mother cannot afford to travel to England. While Jessica and Joseph are in England (and despite appellees' representations to the court, the length of that stay cannot be certain), the mother will have no in-person contact with her children. Appellant's financial incapacity to visit Jessica and Joseph in England notwithstanding, she will be able to write, to call and perhaps, to send audio or video tape recorded messages to her children. When the children return, in-person visitation can resume. Thus, we do not agree with appellant that the court's order precludes *all* visitation. The order does, however, severely limit the extent and nature of her contact. We shall now consider whether such a limited right of visitation constitutes an abuse of discretion under the circumstances of this case.

The court below awarded temporary custody to the foster parents pursuant to section 3–820(c)(1) of the Courts Article, which reads:

> In making a disposition on a petition, the court may [ ] [p]lace the child ... in the custody or under the guardianship of a relative or other fit person, upon the terms the court deems appropriate[.]

Md.Cts. & Jud.Proc. Code Ann. § 3–820(c)(1) (1984). The court exercises its discretion in making a disposition pursuant to § 3–820(c) and its disposition will not be vacated absent an abuse of that discretion. *See In Re David K.*, 48 Md.App. 714, 720–21, 429 A.23d 313 (1981) (decided under former codification). In awarding custody, the court is called to serve the following goals:

> To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; and to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest;
>
> . . . . .
>
> *To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety;*
>
> If necessary to remove a child from his home, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents[.]

Md.Cts. & Jud.Proc. Code Ann. § 3–802(a) (1984) (emphasis added).

In *Montgomery County v. Sanders*, 38 Md.App. 406, 381 A.2d 1154 (1978), we articulated ten criteria to guide courts in discovering the advantages and disadvantages of separating a child from his parents when awarding custody. Although we confronted a petition to modify custody in *Sanders*, its criteria are equally helpful when searching for the

best interest of a child in making an original custody award.
The criteria are:

    (1) fitness of the parents;

    (2) character and reputation of the parties;

    (3) desire of the natural parents and agreements between the parties;

    (4) potentiality of maintaining natural family relations;

    (5) preference of the child;

    (6) material opportunities affecting the future life of the child;

    (7) age, health and sex of the child;

    (8) residences of parents and opportunity for visitation;

    (9) length of separation from the natural parents;

    (10) prior voluntary abandonment or surrender.

38 Md.App. at 420, 381 A.2d 1154 (citations omitted). As to the fitness of appellant, evidence adduced below demonstrates that she is now completely unable to care for these children. Indeed, she admitted as much to the chancellor. About her character and reputation, it is sufficient to state that her criminal record includes drug and prostitution related convictions. Proof of the foster parents' characters and reputations was not offered below. Although there is no agreement between the parties, appellant desires that the foster parents retain custody of her children until she can get her "act together." (It is the location of that custody to which she objects.) The potential for maintaining "natural family relations" is bleak: appellant admits that she is financially and emotionally unable to fill the obligations of motherhood. The children are too young to express a preference. The foster parents are able to provide greater material opportunities affecting the future life of the children. The health of both children has improved since being removed from their parents and being placed with their foster parents. Jessica and Joseph have been separated from their mother for most of their young lives: they were 3 months and 18 months old, respectively, when placed in emergency care; the order we now review was

entered two years later. During that time contact between mother and children was infrequent due, in part, to financial limitations and apparently, in part, to appellant's lack of resolve.

The eighth factor articulated in *Sanders* is the difficult question in this case. We have already indicated that the foster parents' intended move to England, coupled with appellant's poverty, will limit the opportunities for visitation. This fact must weigh against a decision to award custody to the foster parents. Nevertheless, in light of the overwhelming evidence that appellant is now completely unfit to care for these children and unable to enlist the help of relatives or friends in that effort, we cannot say that the chancellor's decision constitutes an abuse of discretion. Evidence offered below suggests that the foster parents have and will provide a stable, healthy and safe environment for the children. Cases involving disputes between natural parents recognize that a custodial parent may take a child out of the country notwithstanding resulting restrictions to the noncustodial parent's visitation rights, *when the move is in the child's best interest. See, e.g., Andrews v. Andrews,* 242 Md. 143, 218 A.2d 194 (1966); *Jordan v. Jordan,* 50 Md.App. 437, 439 A.2d 26 (1982); *Sullivan v. Auslaender,* 12 Md.App. 1, 276 A.2d 698 (1971). We recognize that those cases are distinguishable from the case at bar in that in all of the other cases the children remained with a natural parent; here, they will not. Nevertheless, we believe it an accurate statement of Maryland law that if it is in the best interest of the child, an infant may live out of the country with those who have been awarded custody, notwithstanding that the move will severely limit the visitation rights of the noncustodial parent.

Appellant has been a neglectful mother. Her life of crime and drug dependency compromised the physical well being of her children. At present, she can offer nothing to Jessica and Joseph. A limited stay in a society much like our own but removed from the neglect they have experienced cannot be detrimental to these children. The foster.

parents have provided the only stable family environment Jessica and Joseph have known. To end that merely because the foster parents have temporarily been assigned overseas flies in the face of every goal articulated in the foster care provisions of our Code.

■ For the reasons articulated above, we perceive no abuse in the court's award of custody to the foster parents with minimal rights of visitation to the mother. That award advances the best interests of the children and preserves the aspirations expressed in § 3–902 to separate children from their parents only when necessary for the children's welfare and to secure to the children custody, care, and discipline equivalent to that which should have been given by their parents.

No doubt Jessica and Joseph will develop psychological attachments to their foster parents. Contrary to appellant's contention, however, the likelihood that an infant will develop a parent-child relationship with his foster parents does not preclude separating the child from his natural parents. In compelling cases such as this, a child may be separated from his parents and, thus, family ties may be broken and replaced when necessary for the welfare of the child. *See* Md.Cts. & Jud.Proc. Code Ann. § 3–802(a)(3) (1984). We note that the custody award below contemplates a visitation agreement between the parties. Appellant will not disappear from her children's lives. If visitation under "reasonable circumstances" cannot be agreed upon, she may seek a modification of the order. If such visitation is agreed upon but not allowed, a contempt order may be issued. This order truly gives to appellant that which she requested, *i.e.*, a good home for her children until she gets her "act together." That her children may come to perceive their foster parents as "mother" and "father" is no reason to keep Jessica and Joseph in the sad condition in which they were found while in appellant's care, nor to end a completely successful foster placement in search of another.

## 2. *Jurisdiction*

■ Next, appellant contends that as a juvenile court the court below lacked jurisdiction to issue an order that "effectively terminated [her] parental rights." Only a court of equity, she insists, may terminate such rights. Appellant, however, exaggerates the effect of the court's order and misconceives the nature of the proceedings below.

We previously indicated that, while the June 5 order severely limits the form of appellant's visitation, that right is not altogether precluded. *See supra* at 11–12. Appellant will be able to write to and to telephone her children. When they return to America, in-person visitation will be possible. Thus, the mother's parental rights are not completely terminated by the June 5 order.

That order merely awarded custody to the foster parents. As such, it is subject to modification. See Rule 916a. Further, the court's decision affects only appellant's right of visitation and custody. As the court stated below:

> This is not a termination of parental right. This is not the granting of any adoption or creating of a right of adoption on the part of Mr. and Mrs. P. The law still specifies that before anyone can seek the adoption of any child the natural parent must be notified or at least the attempt to notify them must have been made.

In addition to her right to participate in any effort to adopt Jessica and Joseph in the future, other parental rights, including the right of inheritance, remains with appellant.

Appellant is fearful that, because of the length of the anticipated separation, she may, in the future, lose her children through non-consensual adoption. The Family Law Article provides:

> Without the consent of the child's natural parent, a court may grant a decree of adoption to a stepparent, relative, or other individual who has exercised physical care, custody, or control of a child for at least 1 year, if by clear and convincing evidence the court finds that:

(1) it is in the best interest of the child to terminate the natural parent's rights as to the child;

(2) the child has been out of the custody of the natural parent for at least 3 years;

(3) the child has developed significant feelings toward and emotional ties with the petitioner; *and*

(4) *the natural parent:*

(i) *has not maintained meaningful contact with the child during the time the petitioner has had custody despite the opportunity to do so;*

(ii) *has repeatedly failed to contribute to the physical care and support of the child although financially able to do so; or*

(iii) *has been convicted of child abuse of the child.*

Md.Fam.Law Art. § 5–312(b) (1984) (emphasis added). The emphasized language clearly indicates that appellant controls the means to avoid the mere possibility that her parental rights might, in the distant future, be terminated against her will.

For these reasons, we perceive no merit to appellant's assertion that the court exceeded its powers in awarding custody to the foster parents.

### 3. *Findings*

█ Finally, appellant argues that the disposition in this case must be vacated because the court below failed to announce the reasons for its placement pursuant to Rule 915b. That rule, however, applies to placement of a child outside of the home following a determination on allegations contained in a petition. Rule 915a and b. In the case at bar, that determination was made at the April 3, 1985 hearing when Jessica and Joseph were originally placed outside of their home by the court. The May 28, 1986 hearing that generated the June 5 custody order is governed by Rule 915d.[3] Unlike Rule 915b, Rule 915d does not

---

**3.** Rule 915d applies to the following review hearings:

require the court to announce its reasons in open court and to prepare a statement thereof. In any event, Judge Mitchell made clear the reasons for continuing placement of the children outside of the home at the May 28 hearing:

> Mrs. H is not in any condition at the present time to provide care for these children. Mrs. H may in the future become a resource for the care and treatment of these children. The Court, however, is presented with a here and now.
>
> .　　.　　.　　.　　.
>
> At the present time what is in the best interest of these children is that custody and guardianship be given to Mr. and Mrs. P. The proceedings have moved along rather quickly but they have not moved on so quickly that the rights of the mother or the opportunities of the mother or any chances the mother may have to contact her children have been in any way diminished.... I don't think there's any question that these children will benefit from a placement in a home of these foster parents. The Court will sign an order rescinding the commitment [to BCDSS] and granting custody and guardianship [to Mr. and Mrs. P.].

For those very reasons, we shall presently affirm the June 5, 1986 order. Before doing so, however, we shall direct that the order be modified to include a provision prohibiting the foster parents from adopting the children outside of Maryland. The foster parents agreed to this limitation in the April 30, 1986 stipulation. That stipulation, including the agreement to adopt only in Maryland, was included in the May 15, 1986 order to which appellant

---

In cases in which a child is committed to a local department of social services for placement outside the child's home, the court, within 18 months after the original placement and periodically thereafter at intervals not greater than 18 months, shall conduct a review hearing to determine whether and under what circumstances of the child's commitment to the local department of social services should continue.

The June 5 order was the product of such a hearing.

excepted. In overruling appellant's exceptions, the court failed to reinstate the agreement we now discuss, though it clearly intended to do so. Consequently, pursuant to Rule 1070, we affirm the June 5 order as modified.

JUDGMENT AFFIRMED AS MODIFIED; COSTS TO BE PAID BY APPELLANT.