538 A.2d 305

**In re JESSICA M. and Joseph M.**

**No. 118 Sept. Term, 1987.**

Court of Appeals of Maryland.

March 10, 1988.

Nancy S. Forster, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Susan P. Leviton, Baltimore, for appellees Jessica M. and Joseph M.

Mark J. Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Baltimore City Dept. of Social Services.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, (Retired), Specially Assigned.

This case could serve as the scenario for a Greek tragedy. The cast, however, is composed, not of actors playing their roles, but of real-life people, seriously affected by the events unfolding. The case is about a young mother, ravaged by drugs and suffering all the terrible consequences of her addiction, who realizes that she is unfit to rear her infant children. She is torn between the welfare of her children and her reluctance to have them grow up apart from her. It tells how the children are afforded the opportunity to enjoy a happy present and a hopeful future by the intervention, through judicial processes, of caring government personnel and a concerned judge, who was called upon to exercise the wisdom of Solomon. We believe that he exercised it well.

We set out the facts.[1]

---

1. The essential facts are not disputed. The record supports them as they are stated in the briefs of the parties. We have borrowed from all three briefs in our narration, but especially from that of the Clinical Law Office of the University of Maryland Law School, sub-

In July 1984, police officers in Baltimore City found three infants alone and unsupervised. Two of the infants were Joseph M. and Jessica M.[2] They were placed in emergency shelter care and then in separate foster homes. At the time of their first placement, they were observed by a foster care worker of the Baltimore City Department of Social Services (BCDSS). Joseph was about five months old. He

> was rather fat, very placid, couldn't sit up. Was very red in color. When he ate, he did a lot of projectile vomiting. He ate very greedily and when he spit back up, it was projectile vomiting as opposed to just gurgling ... [H]e could not roll over even partially ... He was not familiar with any type of baby food, other than milk.

Jessica "was several months short of her second birthday."

> She was hungry. Her hair was very dry, listless, wispy. She talked reasonably well. She was not familiar with a lot of food.

She was "somewhat frightened of men and other strangers ..."

On 3 October 1984, BCDSS filed petitions alleging that Joseph and Jessica were children in need of assistance. The petitions alleged that their mother and their father were drug users, had failed to provide the children with adequate shelter, supervision and protection, and that the mother often left home for several days at a time without providing for the children's care. On 24 September and 9 November 1984, respectively, Joseph and Jessica were again placed in separate foster homes in Baltimore City. On 27 November the mother and the father entered into a service agreement with BCDSS. They agreed to attend regularly a drug abuse/urinalysis program, and personal and family counseling sessions, and to visit their children on a weekly basis.

---

mitted on behalf of the children involved here. We have resorted to some editing of and additions to the Statement of Facts therein but have ofttimes set it out verbatim.

**2.** Although the record is not clear, apparently the third child was the children's older brother, John M., Jr.

The agreement also warned that failure to complete it "may prolong [the] children's stay in care." An adjudicatory hearing was held on 30 January 1985. Joseph and Jessica were found to be children in need of assistance.

The foster homes in which the children were placed in 1984 were available only for short-term placements, and BCDSS was unable to find other suitable homes for them in Baltimore City. In order to secure a placement, the BCDSS looked outside the city and found a suitable home in Howard County. On 31 January and 5 April 1985, respectively, Joseph and Jessica were placed in the home of foster parents, Edward Stanley P. and his wife Mary Grace P. ("Mr. and Mrs. Edward P." or "the foster parents").

At the time of her children's placement with the foster parents, the mother had been a cocaine addict for three years and had abused heroin off and on for approximately one year. She had been convicted three times for the crime of possession of narcotics and once for solicitation. She had been unemployed since early 1984. In order to support her drug habit, she had engaged in prostitution and in door-to-door solicitation with UNICEF cups, keeping the contributions for her own use. A disposition hearing was held on 3 April 1985, and the master's recommendations were incorporated in an order of the Circuit Court for Baltimore City. The court committed the children to BCDSS for foster care placement and ordered BCDSS to file progress reports every six months. The court further ordered:

> that the [children's] mother and father shall participate in drug abuse counseling, until such time as they are discharged by their therapists; [and]
>
> that [BCDSS] and the parents shall enter into and abide by the terms of a service agreement; [and]
>
> that a review of [the children's] cases shall be conducted by this court on April 3, 1986, at 9 a.m.

An amended service agreement was prepared by BCDSS in April 1985. This agreement differed from the earlier one only in so far as visitation was to be held monthly and at

the offices of the Howard County Department of Social Services (HCDSS). The mother did not come to the Baltimore City office to sign the agreement until 21 August 1985. She gave no reason for the delay in executing it.

Between April 1985 and May 1986, the mother had no permanent address. She stayed with friends or acquaintances at a total of six different Baltimore City addresses and, for a time, was confined in the City Jail. She did not keep her social workers apprised of her living arrangements and efforts to contact her were fruitless. Contrary to the April 3 court order and amended service agreement, the mother failed to attend either drug abuse counseling or sessions with psychologists or social workers. Her failure to obtain treatment was not due to a lack of funds. Nor did she ask BCDSS to help with the cost of treatment. The last time the mother was drug free was, by her own admission, for "about a month or two" in 1985.

BCDSS arranged monthly visits to Howard County for the mother to see Joseph and Jessica. She was told that she could obtain bus tokens from BCDSS for the ride to Howard County, or, if she had problems with this arrangement, that her social worker would provide transportation. However, it seems that between January 1985 and May 1986, a period of some 16 months, the mother visited her children only four times. Her last visit with her children was on 20 December 1985. In July 1985, the mother was arrested for violating probation. She received a 90–day sentence which she served until her release in November. On 30 January 1986, the mother contacted her Howard County social worker and said there was another warrant out for her arrest in Baltimore City. She was afraid to visit her children because she thought the police would be alerted if she showed up at the HCDSS. She was not heard from again until 3 April 1986 when she again called her social worker. Despite assurances that the police would not be contacted, she again refused to visit her children. Later, she failed to show up for a meeting arranged by the social

worker despite assurances that the police would not be contacted.

The service agreement which the mother signed on 21 August 1985 warned her "that failure to complete the agreement will lead to a recommendation for the termination of [her] parental rights." It also informed her that the agreement would "be reviewed in January 1986 if not sooner," and that the "matter" would be reviewed on 3 April 1986 at 9:00 a.m. before Master Bailey. The warning came to fruition. In late 1985, BCDSS decided to change its plans from reunification with the mother to adoption or custody and guardianship. At that time, BCDSS had no indication that the mother had involved herself in any rehabilitation program or that she was able to care for the children. The children needed a permanent home and the placement with the foster parents had gone well. The decision proved to be in accord with a "Case Recommendation Report" by the local Foster Care Review Board (Baltimore City Eastern Region No. 2). The goals of each local board are:

(1) as to minor children who have resided in foster care under the jurisdiction of the local department for more than 6 months:

(i) to review the cases every 6 months to determine what efforts have been made to acquire permanent and stable placement for these children; and

(ii) to encourage and facilitate the return of each of these children to the child's parent or, on determining that return of a child to the child's parent is not in the best interests of the child, to encourage placement of the child with the child's relatives, provided the placement has legal status, or if neither measure is in the best interests of the child, to encourage efforts at adoption of the child;

(2) to encourage all possible efforts for permanent foster care or guardianship for minor children for whom return to a parent or adoption is not feasible; and

(3) to report to the juvenile court on the status of efforts to secure permanent homes for minor children.

Maryland Code (1984) § 5–544 of the Family Law Article (FL). Each local board is required to "report in writing to the juvenile court and the local department on each minor child whose case is reviewed by the local board." *Id.* § 5–545(a).

In the report, the local board may recommend, as being in the best interest of the minor child:

(1) that the child be returned to the parent or legal guardian;

(2) that the child continue to be placed outside the home and that the present placement plan is appropriate to the child's needs;

(3) that the child continue to be placed outside the home, but that the present placement plan is inappropriate to the child's needs; or

(4) that proceedings be initiated to terminate the rights of the parent as to the child so that the child may be eligible for adoption.

*Id.* § 5–545(b). The local board issued a report on each of Joseph M. and Jessica M. under date of 9 January 1986. The reports stated that the board had "reviewed the permanency planning and current placement [as to each child] in accordance with Article 88A (Sections 114–120) of the Maryland Code and Title IV–B (Section 427) of the Social Security Act."[3] The reports noted that the BCDSS "presented the following goal for permanency for" each child.

---

**3.** Maryland Code (1957, 1979 Repl.Vol.) Art. 88A, §§ 114–120 (Foster Care Review Boards) were repealed by Acts 1984, ch. 296, § 1, effective 1 October 1984. As to present provisions for foster care review boards, see Maryland Code (1984) §§ 5–535 through 5–547 of the Family Law Article.

Title IV–B, § 427 of the Social Security Act is codified at 42 U.S.C.A. § 627 (West 1983). It provides federal funding to state foster care programs which comply with its provisions. See § 675(5) for requirements as to a case review system.

That [each child] be adopted by [the] current foster parents by November, 1986.

The board declared that it "agrees with that goal." It recommended that "this plan be pursued in the child's best interest." It further recommended "that the agency expedite the adoption process due to the foster parents' plans to relocate." The reports stated that the BCDSS "presented the following plan for [each] child's placement until the goal is achieved."

That [each child] remain in the current foster home. The board declared that it "agrees with that placement."

A review hearing before a master was held on 30 April 1986. The foster parents and their counsel, the father and his counsel, counsel for the children and counsel for the mother were present. The mother herself did not appear. Counsel for all the parties, except counsel for the mother, signed a stipulation which declared that "[r]easonable efforts required by 42 United States Code Annotated, Section 672(a)(1) and defined by 42 United States Code Annotated, Section 671(a)(15) have been made."[4] The stipulation recited that the children were adjudicated as in need of assistance and committed to the BCDSS. It stated that the whereabouts of the mother was unknown and that the father was incarcerated and unable to care for the children. The children had been placed in the foster home of Mr. and Mrs. Edward P. in 1985 and had made good adjustments in that home. The disposition section of the stipulation provided that the commitment of the children to the BCDSS be rescinded and that custody and guardianship of them be granted to the foster parents, who shall keep the court and counsel informed of their and the children's whereabouts. The father and the children's older brother were to be granted all reasonable rights of visitation. The foster par-

---

4. 42 U.S.C.A. §§ 671(a)(15) and 672(a)(1) (West 1983) concern the eligibility of a state for federal funding of its foster care and adoption assistance program. The bottom line is that reasonable efforts must be made to keep a child in the parents' home.

ents (who were about to move to England for three years) were not to file for adoption there and any such proceeding must be instituted in Maryland. Under date of 6 May 1986, the master issued a "Memorandum," a copy of which the master certified was mailed the same date to the attorney for each of the parties, including the attorney for the mother, and to the children's parents. The master recommended that the commitments of the children to BCDSS be rescinded and that custody and guardianship be granted to the foster parents with certain conditions. The guardians were not to pursue adoption of the children while overseas, and were to keep the court and counsel advised of the children's whereabouts. The father and the children's older brother were to be granted reasonable visitation rights. On 15 May the circuit court issued an order adopting these recommendations except that the visitation rights included the mother. The mother, however, had filed exceptions on 5 May to the disposition by the master announced on 30 April. The circuit court, therefore, vacated its order of 15 May nunc pro tunc and scheduled a hearing on the exceptions for 27 May. The mother's whereabouts had been unknown for some time, but an hour before the hearing it was ascertained that she had been arrested on 23 May and was in the Baltimore City jail. The hearing was rescheduled for 28 May and on that date all parties, except the father, were present. The father, incarcerated in the Baltimore City jail, was involved in a program being conducted there and had specifically requested that he be excused from appearing at the hearing. As we have seen, he was a party to the stipulation of 30 April. His counsel was present. The hearing proceeded.

The mother testified that she did not want Joseph and Jessica released to her at the present time. She had no job, no home, no money, no family and no idea when she would be getting out of jail. She admitted to a current cocaine problem and described her fight with drug dependency as follows:

> When I stopped ... I wasn't successful at it. Something always would come up that would make me extremely depressed and I'd be crying the blues to myself and get the slightest urge to go get high and I did.

When asked about how long it would take her to get her life together, she answered that she did not know.

BCDSS social workers testified that Joseph and Jessica had made "a very good adjustment, both emotionally and physically" in their foster home. Mr. and Mrs. Edward P. lived in a clean, well-kept and adequately furnished home in Howard County. Joseph had overcome a lot of his developmental problems and had reached an appropriate activity level. He was speaking and was reasonably friendly. Jessica had overcome her fear of strangers, her hair was thicker, and her speech was improving. Both had become very attached to and comfortable with the foster parents who had provided them with "a great deal of love and affection and caring." When Mr. P. comes home from work, the children "are very anxious to greet him ... [T]hey are out the door before he can get in. They're all trying to talk to him at one time. If he sits down, he's got a lap full." The children are "very confident around [Mrs. P.]. They crawl up on her lap, they ask her for things ... They are very comfortable playing around the house."

There was evidence that there were no family resources available to Joseph and Jessica. The mother's parents were deceased and the father's grandmother, who had once cared for one of the children, was no longer able to be a primary caretaker. The other foster homes in which the children had lived were short-term facilities. The children's father, incarcerated on charges of arson, had previously agreed that custody and guardianship be granted to the foster parents. The mother acknowledged that the foster parents were "a great family" and agreed that "they have done well by [her] children." She did not object to their being temporary guardians of the children "until I get my act together ..." It was the opinion of the social workers that it was in the best interests of the children to remain with Mr. and

Mrs. Edward P. rather than be placed in another foster home. Removal from their care would be "very destructive to the children." It was known to all concerned that the foster father, a federal employee, was being transferred to England for three years and that his wife and the children would accompany him. It was stipulated for the record that Mr. and Mrs. P. "will be glad to provide contact with the mother over the period of the next three years [while they are in England]."

The court found that the mother was "not in any condition at the present time to provide care for these children." The court said:

The decision in this case is not based upon the poverty of [the mother] or the advantages of monetary and material sense that might be provided by [Mr. and Mrs. P.]. At the present time what is in the best interest of these children is that custody and guardianship be given to Mr. and Mrs. P. The proceedings have moved along rather quickly but they have not moved on so quickly that the rights of the mother or the opportunities of the mother or any chances the mother may have to contact her children have been in any way diminished. The Court is of the opinion that commitment to the Department of Social Service should be rescinded. This is not a termination of parental right. This is not the granting of any adoption or creating of a right of adoption on the part of Mr. and Mrs. P. The law still specifies that before anyone can seek the adoption of any child the natural parent must be notified or at least the attempt to notify them must have been made. I don't think there's any question that these children will benefit from a placement in a home of these foster parents. The court will sign an order rescinding the commitment and granting custody and guardianship [to Mr. and Mrs. P.].

The court stated that it

will order visitation be available to the natural parent[s] and to [the children's older brother] under the circumstances given the fact that the children may be out of the

country. That visitation may have to be infrequent, but I would ask it be reasonable as possible.

The court denied the exceptions and on 5 June 1986 issued an order in accordance with its announcement.

The mother appealed to the Court of Special Appeals. It affirmed the judgment in an unreported per curiam opinion, and subsequently, upon its own motion, the court withdrew that opinion and filed an opinion to be reported. *In re Jessica M.,* 72 Md.App. 7, 527 A.2d 766 (1987). The judgment of the Circuit Court for Baltimore City was affirmed with direction that it be modified to include a provision that adoption proceedings not be instituted outside of Maryland. *Id.* at 18–19, 527 A.2d 766.[5] We granted certiorari upon petition of the mother.

Two questions are presented in the mother's petition for a writ of certiorari:

1) Did the [circuit court] err in awarding custody and guardianship of [the mother's] children to foster parents who were to move to England?

2) Does the [circuit court] lack jurisdiction to issue an order which effectively terminates [the mother's] parental rights?

Encompassed in the first question is whether the mother had been adequately informed that the actual purpose of the hearing of 28 May 1986 was to determine whether the commitment of the children to the BCDSS was to be rescinded and custody and guardianship be granted to the foster parents. In other words, was she aware that the BCDSS had decided that return of the children to their biological parents was not feasible? Did she understand that the BCDSS recommended, in the best interest of the children, that it be relieved of responsibility for the children

---

**5.** We understand that the Circuit Court for Baltimore City has modified its order of 5 June 1986 to provide that Mr. and Mrs. P. may institute adoption proceedings only in Baltimore City.

The restriction on the institution of adoption proceedings has not been challenged in this case.

by the grant of custody and guardianship to the foster parents? And further, that this recommendation contemplated ultimate adoption in lieu of the placement plan then in effect? The rescission of the children's commitment to the BCDSS and grant of custody and guardianship to the foster parents was the main issue. The propriety of the removal of the children to England was incidental to that issue.

The record reflects clearly that the mother had no valid reason whatsoever to claim that she was unaware of the actual purpose of the hearing or to be a whit surprised by the course it took. As we have seen, she was warned in plain language in the Service Agreement she executed on 21 August 1985 that "failure to complete the agreement will lead to a recommendation for the termination of [her] parental rights." She acknowledged in the agreement that she understood this, and she well knew, of course, that she had utterly failed to abide by any of its terms. The mother was represented by counsel at the hearing on 30 April 1986, and her counsel actively participated in all that occurred thereafter, culminating in the final order of 5 June 1986. The mother's counsel had full knowledge of the stipulation entered into on 30 April by all of the parties' counsel, except the mother's counsel, who refused to sign it. The stipulation, as we have seen, provided notice of the position of the BCDSS and evidenced agreement by all the other parties with that position, namely, that the children's commitment to the Department be rescinded and custody and guardianship be granted to the foster parents. Although the master did not confirm in writing his disposition of the matter reached at the 30 April hearing until he filed a memorandum on 6 May, the mother, through her counsel, on 5 May, filed exceptions to the master's disposition. A copy of the 6 May memorandum was sent to the mother's counsel, as was a copy of the order of 15 May, later aborted by reason of the mother's exceptions. A copy of the order of 27 May, vacating the premature order of 15 May, was also served on the mother's counsel. In short, it is readily apparent from the record that the mother's counsel was fully aware, at

least since 30 April, what the position of the BCDSS was and what the recommendations of the master were. There is nothing in the record to indicate that the mother's counsel, once her whereabouts were discovered, did not impart that knowledge to the mother, or that the mother was not fully cognizant of the situation on her own.[6] The judge announced at the hearing of 28 May:

> [T]he reason for this hearing is that these children have been under the commitment of the Department of Social Services for approximately fourteen months. We are required to hold a child in placement hearing and the purpose of that child in placement hearing is to determine whether or not the children should remain under a commitment to the Department of Social Service, and if they are to remain under a commitment to the Department of Social Service, under what circumstances.

The mother's counsel advocated that the children should remain under commitment to the BCDSS. Her argument did not go to any insufficiency as to notice of the purpose of the hearing. Rather, it was whether the BCDSS and the master had properly reached the disposition they recommended. The mother's counsel requested a de novo plenary hearing on the matter, and it was granted.

We turn to the second question presented by the mother, for if the circuit court exercising juvenile powers had no jurisdiction to issue its order, as the mother insists, we need go no further.

We spelled out the jurisdiction and authority of a circuit court exercising juvenile functions and the jurisdiction and authority of a circuit court exercising equity functions in *In re Arlene G.*, 301 Md. 355, 483 A.2d 39 (1984). A juvenile

---

6. We note that the Case Recommendation Reports of the Foster Care Review Board of 9 January 1986 were received in evidence at the 28 May 1986 hearing before the Circuit Court for Baltimore City over the objection of the mother's counsel and in her presence. As we have seen, *supra,* the Reports declared the Board's agreement with the goal of the Department to have the children adopted by the current foster parents and recommended that the adoption process be expedited as in the best interest of the children.

court [7] "has exclusive original jurisdiction over a child alleged to be in need of assistance." *Id.* at 360, 483 A.2d 39, citing Md.Code (1974, 1984 Repl.Vol.) § 3–804(a) of the Courts and Judicial Proceedings Article (CJ). In making disposition upon an adjudication, a juvenile court may "place the child in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate ..." *Id.*, citing CJ § 3–820(c)(1), now § 3–820(c)(1)(i). An equity court "has jurisdiction over the adoption of a child." *Id.*, citing FL § 1–201(a)(1). "The jurisdiction over adoption does not extend to a juvenile court." *Id.* at 361, 438 A.2d 39. We explained:

> A juvenile court is not empowered to deal with the transcendent problem of severing all legal ties and providing for the adoption of a child by others.

*Id.* However, an equity court also "has jurisdiction over the custody or guardianship of a child." *Id.*, citing FL § 1–201(a)(5). But:

> The jurisdiction and authority of [an equity court] as to a child does not take away or impair the jurisdiction of a juvenile court with respect to the custody or guardianship of the child.

*Id.*, citing FL § 1–201(c). Since *In re Arlene G.* was decided, FL § 1–201 was amended, effective 1 July 1986, by adding subsection (d), which prescribes:

> If an adoption or guardianship with the right to consent to adoption or long-term care short of adoption is ordered by the equity court, as to a child previously adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the jurisdiction of a juvenile court with regard to these issues is terminated.

We summarized:

> In short, as to a child in need of assistance, the jurisdiction of the Juvenile Court regarding custody generally

---

**7.** In this opinion "juvenile court" refers to a circuit court hearing juvenile matters and an "equity court" refers to a circuit court hearing equity matters.

prevails over the jurisdiction of the Equity Court regarding custody. The legislature clearly intended that there be no inconsistency between the jurisdiction and authority it bestowed on a Juvenile Court with respect to a child and the jurisdiction and authority it bestowed on an Equity Court with respect to a child. The various statutes are harmonious.

*In re Arlene G.*, 301 Md. at 362, 483 A.2d 39.

■ The mother urges that because the children were to live in England for three years her parental rights will be terminated. The children would be completely cut off from her and she would be made a legal stranger to them. She concludes:

[B]ecause [she] has no access to her children and because nothing precludes the foster parents from remaining in England indefinitely, the award of custody of [her] children to these foster parents effectively terminates her parental rights. The juvenile court was without jurisdiction to issue such an order.

We do not agree. Although the mother herself admitted that she was in no condition to provide care for the children at the present time, the court did not discard the possibility that she "may in the future become a resource for the care and treatment of these children." The court was careful to point out:

This is not a termination of parental right. This is not the granting of any adoption or creating of a right of adoption on the part of [the foster parents]. The law still specifies that before anyone can seek the adoption of any child the natural parent must be notified or at least the attempt to notify them must have been made.

The order required that the foster parents "allow visitation to the natural parents and sibling ... under reasonable circumstances given that the [foster parents] may be residing outside the continental United States." Furthermore, any adoption proceedings can only be instituted in Baltimore City. The order, neither by intent nor letter, terminat-

ed the mother's "parental rights," such as they may be. The order did not divest the juvenile court of jurisdiction. CJ § 3–806(a). "Jurisdiction and custody are separate and distinct." *In re Arlene G.*, 301 Md. at 360, 483 A.2d 39, citing *In re Johanna F.*, 284 Md. 643, 651, 399 A.2d 245 (1979). The order simply placed the children in the custody and under the guardianship of persons who, it is not disputed, were fit to care for them, upon terms the court deemed appropriate. Its jurisdiction to do so was beyond question. CJ § 3–820(c)(1)(i).

We note that "[i]f the [juvenile] court obtains jurisdiction over a child, that jurisdiction continues until that person reaches 21 years of age unless terminated sooner," CJ § 3–806(a), and, ordinarily, the retention of jurisdiction is within the discretion of the juvenile court, CJ § 3–806(c). The jurisdiction obtained is continuous. Here, the juvenile court retained its jurisdiction over the children and exercised it by its order of 5 June 1986.

■ We have determined that the challenged order was within the juvenile jurisdiction of the Circuit Court for Baltimore City. We now return to the first question presented by the mother, namely, did the court err in awarding custody and guardianship of the children to foster parents who were to move to England for three years.

In *Davis v. Davis*, 280 Md. 119, 372 A.2d 231, *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh'g denied*, 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978), we clarified the standard of appellate review in child custody cases. *Id.* at 122, 372 A.2d 231. "In sum, we point[ed] out three distinct aspects of review in child custody disputes." *Id.* at 125, 372 A.2d 231.

When the appellate court scrutinizes factual findings, the clearly erroneous standard of Rules 886 and 1086 applies. If it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal princi-

ples and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* at 125–126, 372 A.2d 231 (footnote omitted).

In the case before us, the facts were undisputed. We have enunciated the legal principle involved time and time again. We said in *Butler v. Perry*, 210 Md. 332, 342, 123 A.2d 453 (1956):

> Of course, it is too elementary to be stressed that the welfare of the child is the controlling test in a custody case.

We pointed out in *Ross v. Hoffman*, 280 Md. 172, 174–175, 372 A.2d 582 (1977): "This best interest standard is firmly entrenched in Maryland and is deemed to be of transcendent importance." We observed in *Ross* that the standard was so characterized in *Dietrich v. Anderson*, 185 Md. 103, 116, 43 A.2d 186 (1945), and that

> the decisiveness of the best interest standard is emphasized by the various other ways reference is made to it in our opinions. For example, it was characterized as the "ultimate test" in *Fanning v. Warfield*, 252 Md. 18, 24, 248 A.2d 890 (1969); the "determining factor" in *Heaver v. Bradley*, 244 Md. 233, 242, 223 A.2d 568 (1966); the "paramount consideration" in *Glick v. Glick*, 232 Md. 244, 248, 192 A.2d 791 (1963); the "sole question" in *Young v. Weaver*, 185 Md. 328, 331, 44 A.2d 748 (1945); the "paramount question" in *Piotrowski v. State*, 179 Md. 377, 381, 18 A.2d 199 (1941).

*Ross*, 280 Md. at 175 n. 1, 372 A.2d 582. The court here applied that legal principle and its decision was governed thereby. As we have seen, the judge in arriving at the disposition of the children, said: "I don't think there's any question that these children will benefit from a placement in a home of these foster parents." He declared flatly: "At the present time what is in the best interest of these children is that custody and guardianship be given to Mr. and Mrs. P." Therefore, since the court's conclusion was based upon accepted facts and was founded upon a sound

legal principle, its decision should be disturbed only if there has been a clear abuse of discretion.

The mother's contention that there was a clear abuse of discretion here is bottomed solely on the fact that the children would be in England for three years. She does not object to the grant of custody and guardianship to the foster parents per se. She is content that the foster parents would be fit guardians and that it would be in the children's best interest to be in their custody. She realizes that she is physically, financially and emotionally unable to care for her children at the present time or within the reasonably near future. An admitted drug addict, unable to shake the habit, incarcerated from time to time, she acknowledged that she has no money, no job or prospects of obtaining a job to earn sufficient means for the children's care, no place in which to house them, and no relatives to whom to turn for help. The children's father is in no better position. She vows that she does not want to hurt either the children—"I want them to have care"—or the foster parents—"they've done a lot for my children." But she insists on what she considers her "rights" of visitation, even if it means uprooting the children from the only stable, nurturing, and happy home they have known and enjoyed in their young lives. She would compel the BCDSS to resort again to short-term placements, probably in separate homes, and to start afresh to attempt to find a suitable foster home.[8] She asserts what she deems to be her "rights" of visitation despite that, to all intent and purpose, she had precipitated a severance of a continuing relationship with her children and prevented a reunification with them. She failed utterly to live up to several service agreements she signed, and several court orders, even after fair warning of the probable consequences of failure to

---

**8.** It seems that this is an increasingly difficult task in Baltimore City. See Foster Care Review Board Annual Report, 1986 (December 1987). The Board calls the situation in Baltimore City "alarming," where "[a]lmost nightly, workers struggle to locate beds for children entering care or being moved to a new placement." *Id.* at 2.

comply with their terms. She virtually ignored the children from the time they were found by the police. She visited them only very infrequently, even though the BCDSS went out of its way to make it possible and easy for her to see them. As is common in custody disputes, the children are not only the innocent victims, but, of course, have the most at stake. Awash in the wake of parental misfortunes and economic adversity, mainly self-induced by the parents, the children's well-being, both present and future, would be profoundly affected by the court's custodial disposition of them. In the circumstances, the lamentations of the mother that she would be isolated physically from her children for three years are, to say the least, not very persuasive when weighed against the best interest of the children.

We examine the mother's "rights of visitation" vis-a-vis the "best interest" of the children. Visitation rights ordinarily go with the grant of custody. "The greater includes the lesser ..." *Andrews v. Andrews,* 242 Md. 143, 154, 218 A.2d 194 (1966). "Express request for visitation rights in a custody case is not necessary to sustain a decree granting such rights." *Id.* at 155. This Court has recognized as a general rule that a parent whose child is in the custody of another should have a right to visit him unless the best interests of the child would be endangered by such contact. *Radford v. Matczuk,* 223 Md. 483, 487–488, 164 A.2d 904 (1960). We explained by quoting 2 Nelson, *Divorce* § 15.26 (2d ed. 1945):

> "[A] parent whose child is placed in the custody of another person has a right of access to the child at reasonable times. *The right of visitation is an important, natural and legal right, although it is not an absolute right, but is one which must yield to the good of the child.* A parent's right of access to his or her child will ordinarily be decreed unless the parent has forfeited the privilege by his conduct or unless the exercise of the privilege would injuriously affect the welfare of the child, for it is only in exceptional cases that this right should be denied. And in the absence of extraordinary circumstances, a parent should not be denied the right of visitation,

even though the parent has been guilty of marital misconduct. But when it is clearly shown to be best for the welfare of the child, either parent may be denied the right of access to his or her own child."

*Radford,* 223 Md. at 488, 164 A.2d 904 (emphasis added). We cited, *id.,* to

Keezer, *Marriage and Divorce,* § 723 (3rd ed. Morland); Sayre, *Selected Essays on Family Law,* p. 616; 17A Am.Jur., *Divorce and Separation,* § 829 [1957].

*See* 24 Am.Jur.2d, *Divorce and Separation* § 999 (1983). We said in *Maddox v. Maddox,* 174 Md. 470, 476, 199 A. 507 (1938):

While the court usually does not deny to a parent the opportunity to visit the child, and occasionally to have temporary custody at suitable times, nevertheless even this comfort may be denied the parent, if the best interest of the child is subserved.

In short, "[r]ights of father and mother sink into insignificance before [the best interest of the children]." *Dietrich v. Anderson,* 185 Md. at 118, 43 A.2d 186, quoting from *In re Bort, Petitioner, etc.,* 25 Kan. 308, 37 Am.Rep. 255 (1881), as quoted in *Kartman v. Kartman,* 163 Md. 19, 22, 161 A. 269 (1932).

The Court of Special Appeals was faced in *Jordan v. Jordan,* 50 Md.App. 437, 439 A.2d 26, *cert. denied,* 293 Md. 332 (1982), with a question comparable to the one the mother presents here. It found that "[t]he great weight of authority in this country permits a minor child to move freely with the custodial parent." *Id.* at 446, 439 A.2d 26. It quoted, *id.* at 447, 439 A.2d 26, *Hoyt v. Boyar,* 5 F.L.R. 2135, 2135–2136 (N.Y.Fam.Ct., Sullivan County, 1978, *modified,* 77 A.D.2d 685, 429 N.Y.S.2d 792 (1980):

Relocating as the result of remarriage, employment and the like cannot of itself render a parent to whom custody has been granted unfit and thereby constitute the basis for a modification of custody. See *Matter of Susan "KK" v. Rudolpho "KK",* 39 A.D.2d 792 [331 N.Y.S.2d 523] (3d Dept.1972).

*See also* cases cited and discussed in *Jordan,* 50 Md.App. at 447–451, 439 A.2d 26.

The order challenged here specifically provides for visitation which would be reasonable in the circumstances. The court encouraged the guardians to facilitate contact by the mother with the children, and the guardians' counsel placed on the record that the guardians "will be glad to provide contact with the mother" while the children are in England. There was no reason advanced to indicate that they will not do so. The legislature recognized that in juvenile causes family ties may be broken and a child separated from his parents when necessary for his welfare. CJ § 3–802(a)(3). Beyond question, it is necessary in this case.

In the light of the circumstances, the court here did not abuse its discretion in its decision. We note that if there were any doubts (but there are none whatsoever), it is the announced legislative policy "to resolve doubts in favor of the child when there is a conflict between the interests of a minor child and the interests of an adult." FL § 5–502(b)(2).

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED;

COSTS TO BE PAID BY PETITIONER.